Stephens Marine, Inc., successor in interest to Stephens Brothers, Incorporated, Petitioner v. Commissioner.
Stephens Marine, Inc. v. Commissioner
Docket No. 298-65.
United States Tax Court
T.C. Memo 1969-39; 1969 Tax Ct. Memo LEXIS 256; 28 T.C.M. (CCH) 199; T.C.M. (RIA) 69039; February 25, 1969, Filed *256 Stephens Brothers, Incorporated, built three coastal minesweepers for the United States Navy. These vessels were completed and accepted by the Navy, in Stephens Brothers, Incorporated's final taxable year, ended October 4, 1960, the date of the corporation's liquidation. At the date of liquidation all but $59,987.70 had been paid by the Navy on the contract, and the $59,987.70, although earned, was withheld until all adjustments were made at final settlement. The corporation employed the completed contract method of accounting under the contract. Payments for increased labor costs were made in fiscal 1960, in the amount of $57,539.33, resulting from a preliminary determination of the increased costs based on data submitted by Stephens Brothers, Incorporated. Stephens Brothers, Incorporated, had five uncompleted yachts under construction as of October 4, 1960, pursuant to five separate contracts with private individuals. This corporation employed a completed contract method of accounting in reporting income resulting from the construction of private pleasure craft. As of its date of liquidation, October 4, 1960, Stephens Brothers had incurred costs (for material and labor) in constructing *257 the five uncompleted vessels in the aggregate amount of $84,560 and, as of October 4, 1960, Stephens Brothers had received prepayments or advance payments totaling $135,767, in accordance with the terms of the contracts, with no restrictions as to the use of the payments received. Upon the facts, held, (1) that the Commissioner did not err in including the $59,987.70 retained by the Government until final settlement, as income of Stephens Brothers, Incorporated, for the taxable year ending October 4, 1960; (2) that the $57,539.33 paid to Stephens Brothers, Incorporated, for adjustments for labor costs was properly includable in the taxable year ending October 4, 1960, the year of receipt; (3) that the Commissioner did not err including $32,972.00 as income of Stephens Brothers, Incorporated, resulting from private hull construction for the taxable year ending October 4, 1960. Robert E. Tout, 999 Bel Air Bldg., Stockton, Calif., for the petitioner. Leo McLaughlin, for the respondent. 200 HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined a deficiency of $108,885.37 in the income tax liability of Stephens Brothers, Incorporated, for its final fiscal *258 year, November 1, 1959, to October 4, 1960. Stephens Brothers, Incorporated, is the predecessor of Stephens Marine, Inc., the petitioner. The issues for decision are: (1) Whether there is includable in the income of Stephens Brothers, Incorporated, for its final fiscal year ended October 4, 1960, under Contract No. 3931 with the Navy Department, the sum of $59,987.70; or whether such income should be deferred. On brief, petitioner has conceded that $6,000 is includable in income of the year ended October 4, 1960, leaving in dispute $53,987.70. (2) Whether there should be excluded from the income of Stephens Brothers, Incorporated, for its final taxable year, with respect to the same contract, the sum of $57,539.33, for increased labor costs. This issue was presented in the second amendment to the petition. Petitioner's predecessor included this amount in income for its final taxable year. Petitioner claims that this item should be deferred to a later year. (3) Whether there should be included in the income of Stephens Brothers, Incorporated, for its final taxable year ended October 4, 1960, with respect to contracts to construct boats for individuals, the adjusted aggregate sum of *259 $32,972, representing payments received from the individual purchasers. The parties have agreed upon several adjustments; they will be given effect under a Rule 50 computation. Findings of Fact Some of the facts have been stipulated. The stipulated facts are so found and are incorporated herein by reference. The income tax return of Stephens Brothers, Incorporated, for the fiscal year November 1, 1959, to October 4, 1960, was filed with the district director of internal revenue at San Francisco, Calif.
The petitioner, Stephens Marine, Inc., is the successor to Stephens Brothers, Incorporated, which was liquidated under a section 334(b)(2) liquidation on October 4, 1960, when all of its assets and liabilities were acquired by the petitioner. Stephens Marine, Inc., is a California corporation organized on May 31, 1960, for the purpose of acquiring Stephens Brothers, Incorporated. Stephens Marine, Inc., was originally named Sea Craft, Inc. This latter corporation engaged in negotiations for the purchase of Stephens Brothers, Incorporated, and on August 12, 1960, Sea Craft purchased all the outstanding shares of Stephens Brothers, Incorporated. On October 4, 1960, Sea Craft, Inc., changed *260 its name to Stephens Marine, Inc., and liquidated all of the assets and liabilities of its predecessor into itself. The details about the above matters are: Stephens Brothers, Incorporated, a California corporation, was organized on March 27, 1942, having 5,000 shares authorized of no par common stock, of which 2,000 shares were issued in exchange for the operating assets of a partnership called Stephens Brothers. During the period November 1, 1959, to about August 12, 1960, the outstanding common stock of Stephens Brothers, Incorporated, consisted of 1,457 2/3 shares which were held in equal amounts by the brothers, Theodore J. and Richard T. Stephens. In May 1960, Theodore and Richard began to negotiate for the sale to another corporation of all of their shares of stock in Stephens Brothers, Incorporated, their 1,457 2/3 shares, and on June 6, 1960, they agreed to sell those shares to the other corporation, Sea Craft, Inc., a California corporation, for $1,612,646.52, and on August 12, 1960, the sale was completed and they delivered all of their stock to Sea Craft. As stated above, the name of Sea Craft was changed on October 4, 1960, to Stephens Marine, Inc., and on the same date *261 it exchanged all of the issued stock of Stephens Brothers for all of the assets and liabilities of Stephens Brothers, and then Stephens Brothers was liquidated. For Federal income tax purposes, the liquidation of Stephens Brothers was carried out under section 334 (b)(2), 1954 Code, which is stipulated. At all times, the principal place of business of both Stephens Brothers and Stephens Marine, Inc., was located in Stockton, Calif. Theodore and Richard Stephens are the president and secretary of Stephens Marine, Inc., respectively, each one having held the same office in Stephens Brothers. Petitioner's place of business, when the petition was filed, was in Stockton, California. The last taxable year of Stephens Brothers, Incorporated, was the fiscal year November 1, 1959, to October 4, 1960. The income tax deficiency in dispute relates to the income tax liability of Stephens Brothers, Incorporated, for the fiscal year ended October 4, 201 1960, which is sometimes referred to hereinafter as Stephens Brothers. Stephens Brothers, Incorporated, was engaged in the following business activities: (a) It constructed boats and ships for sale and carried them in its inventory. (b) It did repair *262 work on boats. (c) It operated a retail marine store. (d) It entered into contracts, with private persons, or with the Government, to construct boats and ships. Its predecessor, the partnership named Stephens Brothers, had been engaged in the same business activities since 1906. Stephens Brothers, Incorporated, at times, built pleasure craft, under specific contracts with individual buyers, or for its own inventory of boats held for sale; and it also entered into contracts with the United States Navy, Bureau of Ships, to construct minesweepers and other large hulls. Its principal income was derived from Government contracts and from sales of pleasure craft. Issue 1: Contract to Build Minesweepers On April 19, 1957, Stephens Brothers, Incorporated (Stephens Brothers) contracted with the United States Navy Department, Bureau of Ships (the Navy) to construct three coastal minesweepers, numbers MSC 281, MSC 282, and MSC 283, for a total contract price of $5,394,407.86, which amount was subject to adjustment. The contract was written on a form of the Department of Defense, Contract No. 3931; the form is entitled "Department of Defense Negotiated Contract (Fixed Price Type)." The contract *263 includes General Provisions and Special Provisions. It was provided in Article 4 of the Special Provisions, Compensation, that "The contract price of each vessel, including plans and other data," is "$1,798,135.95", and that the total contract price is $5,394,407.86, "subject to adjustment as provided in this contract." The contract is incorporated herein by reference. It was provided that the three mine-sweepers were to be delivered in 1959, at Mare Island Naval Shipyard, Vallejo, Calif., as follows: MSC 281 in April 1959; MSC 282 in June 1959; and MSC 283 in August 1959. The contract provided inter alia that the vessels were to be constructed by Stephens Brothers at Stockton, Calif., in conformity with all specifications set forth in Article 2 of the contract, including such changes therein as might be required. For the purposes of this case, the material and relevant provisions of the Navy contract for the construction of the three coastal minesweepers, MSC 281, MSC 282, and MSC 283, relate to the following: periodic payments; price adjustments for change orders; price adjustments for labor and material costs; preliminary acceptance of each of the three hulls; the guaranty period, *264 a test period during which each hull is subjected to final tests by the Navy; final acceptance of each of the three hulls; and final settlement, the ending of all of the contractual obligations, at which time the contractor receives payment of all unpaid amounts owed by the Navy, and, in turn, the contractor executes a release, relieving the Navy of all obligations, liabilities, and claims under the contract. The provisions relating to payments, price adjustments for change orders, and price adjustments for labor and material costs are set forth in the so-called Special Provisions of the contract, and the provisions relating to preliminary acceptance, the guaranty period, final acceptance, and final settlement are set forth in the so-called General Provisions of the contract. The material and relevant provisions are as follows: SPECIAL PROVISIONS: Article 5. PAYMENTS. - (a) The Government, upon submission by the Contractor of invoices, certified by the Contractor as hereinafter provided, will promptly make payments on account of the contract price, of ninety percent (90%) of an amount determined by applying to the total contract price the percentage of physical progress in the performance *265 of the contract as a whole as certified by the Contractor subject to the approval of the Supervisor; provided, that no such payment shall be made in an amount which when added to the total of all payments previously made exceeds the costs certified by the Contractor on the related invoice to have been incurred by it in the performance of the contract plus five percent (5%) of such costs. Such invoices may be submitted semimonthly or more frequently if expenditures by the Contractor warrant, and shall be based upon the contract price as adjusted from time to time as the result of change orders pursuant to the Article of this contract entitled "Changes". * * * (b) Upon preliminary acceptance of each vessel and upon the submission of properly certified invoices, the Government will pay to the Contractor the amount withheld under paragraph (a) in excess of three percent (3%) of the contract price of such vessel as adjusted by change orders, said percentage consisting of (i) a performance reserve of two percent (2%) and (ii) an additional reserve for final settlement of one percent (1%), 202 provided that such final settlement reserve shall not exceed $100,000 for the entire contract. * *266 * * (c) The Government shall, at the time of final settlement, in accordance with the provisions of the Article entitled "Final Settlement", pay the Contractor the balance owing to it under the contract promptly after the amount of such balance shall have been determined. (d) The Government may, in its discretion, make payments prior to final settlement on account of the reserves established under this Article subject to such conditions precedent as the Contracting Officer may prescribe. GENERAL PROVISIONS: Article 4. CHANGES. - The Chief of the Bureau of Ships or his duly authorized representative may at any time, by a written order, and without notice to the sureties, make changes within the general scope of this contract, on any one or more of the following: * * * If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. SPECIAL PROVISIONS: Article 7. PRICE ADJUSTMENTS. - (a) Labor. - The total contract price is subject to adjustment for changes in the cost of labor *267 incurred in the performance of the contract in accordance with the following provisions: (i) Adjustment with respect to labor costs shall be made on the basis of the "Index of change in straight-time average hourly earnings for selected shipyards" (composite national index, wood construction) hereinafter called the "Labor Index", as published by the Bureau of Labor Statistics, United States Department of Labor. Adjustments shall be determined by the Office of the Comptroller of the Navy (Contract Audit Division) with respect to each calendar month. The basic month shall be February 1957. The labor adjustment, upward or downward, as the case may be, for each calendar month shall be the amount by which the expenditures of the Contractor for direct plant labor during such month, excluding wage premiums for overtime and shift work, differ from the amount obtained by multiplying the Contractor's said expenditures by the Labor Index for the basic month and dividing the product by the Labor Index for the calendar month involved. (b) Materials. - The total contract price is subject to adjustment for changes in material costs incurred in the performance of the contract in accordance with the *268 following provisions: (i) Adjustment for changes in the cost of lumber for the vessels shall be made on the basis of the composite Lumber Index, Group 08, Lumber and Wood Products (excluding Millwork), and adjustment for changes in the cost of all other materials for the vessels shall be made on the basis of the composite materials index, Group 10, Metals and Metal Products, as published by the Bureau of Labor Statistics, United States Department of Labor. Adjustments shall be determined by the Office of the Comptroller of the Navy (Contract Audit Division) with respect to each calendar month. The basic month shall be February 1957. The adjustment for lumber and the adjustment for other materials, upward or downward, as the case may be, for each month shall be the amount by which the aggregate amount of firm quotations (including the basic price in all quotations on a price adjustment basis, and the fixed fee in all quotations on a cost-plus-a-fixed-fee basis), accepted by the Contractor for direct and indirect materials during such month differs from the amount obtained by multiplying the Contractor's said firm quotations by the appropriate Index for the basic month and dividing the *269 product by the appropriate index for the month involved. * * * (d) Any dispute with respect to the determination of the Labor adjustment or the Materials adjustment by the Office of the Comptroller of the Navy (Contract Audit Division) shall be decided by the Director, Contract Audit Division, Office of the Comptroller of the Navy, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. * * * (e) Final adjustment under this Article will be deferred until final settlement, but the Government may make partial payments under this Article prior to final settlement subject to such conditions precedent as the Contracting Officer may prescribe. (f) The Department may substitute for the foregoing method of adjustment for changes in labor and materials cost or for the aforementioned indices any other method or index if it should appear at any time in the judgment of the Chief of the Bureau of Ships that the specified method or indices do not equitably reflect the increases or decreases in the cost of labor or materials under this contract. 203 GENERAL PROVISIONS: Article 5. PRELIMINARY ACCEPTANCE. - Upon satisfactory completion of the applicable *270 trial requirements and upon delivery as provided in the Article of this contract entitled "Completion and Delivery", each vessel shall be preliminarily accepted. GENERAL PROVISIONS: Article 6. GUARANTY PERIOD. - As used in this contract, the term "defects" includes any and all defects, deficiencies, deteriorations, and failures in the vessels. There shall be a guaranty period for each vessel consisting of the three (3) months immediately following the date of its preliminary acceptance, * * * During said period such vessel, after being fully equipped and armed and in all respects complete and ready for service, shall be finally tried by and at the expense of the Government under conditions prescribed by the Secretary. * * * * * * GENERAL PROVISIONS: Article 8. FINAL ACCEPTANCE. - Each vessel shall be finally accepted, upon the expiration of its guaranty period, if it shall be found by the Chief of the Bureau of Ships to have been constructed in conformity with the plans and specifications. * * * GENERAL PROVISIONS: Article 19. FINAL SETTLEMENT. - Upon final acceptance of the vessels, * * *, the Contractor shall be entitled to receive the balance owing to it under this contract, *271 such payment to be made promptly after the amount of such balance shall have been determined. The Contractor and each assignee under an assignment in effect at the time of final settlement shall execute and deliver at the time of and as a condition precedent to final payment, a release in form and substance satisfactory to and containing such exceptions as may be found appropriate by the Contracting Officer, discharging the Government, its officers, agents and employees of and from liabilities, obligations and claims arising under this contract. The Contracting Officer may authorize partial payments on account of any such balance to be made in advance of final settlement. * * * Article 5, paragraph (a), Special Provisions, provides for payments by the Navy to the contractor, Stephens Brothers, upon the periodic submission of certified invoices by the contractor. It is provided that the certified invoices may be submitted by the contractor semimonthly, or oftener, and it is provided that upon submission by the contractor of a certified invoice, the Navy is to pay 90 percent of an amount determined by applying to the total contract price, the percentage of physical progress in the performance *272 of the contract as a whole, as certified by the contractor, subject to the approval of the Supervisor of Shipbuilding, San Francisco, Calif. It is further provided that the payments made by the Navy to the contractor, Stpehens Brothers, during the course of construction of the three mine-sweepers, are not to exceed the costs certified by the contractor on the related invoice to have been incurred by it in the performance of the contract plus 5 percent of such costs. Article 5, paragraph (a), provides that the total contract price, for the purposes of making periodic payments, is the contract price as adjusted from time to time as the result of change orders pursuant to Article 4 of the General Provisions, entitled "Changes". For the purpose of making periodic payments, Article 5, Special Provisions, does not incorporate Article 7, Special Provisions, relating to adjustments (up or down) for labor and material costs, which eventually affect "total contract price", which is subject to adjustment. Article 7, Special Provisions, Price Adjustments, relates to adjustments of the total contract price resulting eventually from adjustments, up or down, for changes in the cost of labor, and *273 for changes in the cost of materials. In Article 7(a) it is provided that the adjustment for labor cost may be upward or downward, and it is provided that the amount of the labor adjustment is determined by the extent to which the expenditures of the contractor each month for direct plant labor (excluding overtime, i. e., actual labor costs incurred) differs from "the amount obtained by multiplying the Contractor's said expenditures by the Labor Index for the basic month and dividing the product by the Labor Index for the calendar month involved." The Index provided in the contract is the "Index of change in straight-time average hourly earnings for selected shipyards" (composite national index, wood construction) published by the Bureau of Labor Statistics, United States Department of Labor. It is provided in Article 7(f) that a new method or index may be substituted by the Navy if it should appear that the method or indices provided in the contract do not equitably reflect increases or decreases in the cost of labor or materials under the contract. In more general terms, the provision for adjustments for labor costs allows an eventual adjustment (either an 204 increase or a decrease) *274 in the total contract price, to the extent the contractor's actual labor costs are greater or less than the average national labor costs for the same amount of work during a given month. Article 7(b) provides for eventual adjustments (either upward or downward) in the total contract price, to the extent that the contractor's material costs for each month (i. e., firm quotations on materials to be supplied, which are accepted by the contractor) are greater or less than the average costs of the same materials (as computed by composite materials indices for wood products and metal products as published by the Bureau of Labor Statistics, United States Department of Labor). It is provided that the adjustments for both labor costs and for materials costs with respect to each calendar month are to be made by the Office of the Comptroller of the Navy (Contract Audit Division). Article 7(e) provides that the final adjustment in the total contract price as a result of labor and material cost adjustments, if any, is to be deferred until final settlement. But Article 7(e) also provides that partial payments may be made by the Navy as the result of tentative adjustments under Article 7 for changes *275 in labor and materials costs, subject to such conditions precedent as the contracting officer in the Navy shall prescribe. It is noted that the provision in Article 5(a) of the Special Provisions, relating to payments, provides that the amounts to be paid periodically are determined on the basis of the total contract price, as adjusted for "changes" under Article 4 of the General Provisions, but not as adjusted for price adjustments for changes in labor and material costs. Article 5(b) provides for the payment at the preliminary acceptance of each vessel of the amounts withheld under Article 5(a) (namely the 10 percent of the amount determined by applying the percentage of physical progress in performance of the contract to the total contract price withheld by the Navy when it makes each periodic payment to the contractor), which are in excess of three percent of the total contract price. It is provided that each vessel is to be preliminarily accepted by the Navy, upon completion (together with satisfactory completion of applicable trial requirements) and delivery of such vessel to the Navy. Stated briefly, Article 5(b) provides that upon completion and delivery of each minesweeper, *276 the Navy is to pay all but three percent of the amounts withheld by the Navy during the course of construction. In Article 5(b), Special Provisions, it is provided that the three percent of the total contract price retained by the Navy at the preliminary acceptance of each minesweeper consists of (1) a two percent performance reserve, and (2) an additional reserve for final settlement of one percent. A condition, included in a part of Article 5(b), which is not set forth above, indicates that the purpose of the two percent performance reserve is "to meet the cost to the Government of finishing any unfinished work under the contract for which the Contractor is responsible, or of correcting defects for which the Contractor is responsible under the contract, developing prior to preliminary acceptance or during the guaranty period of any vessel. * * *." It is provided in Article 5(c) of the Special Provisions that the balance owing to the contractor is to be paid by the Navy at the time of final settlement. There is no provision in the contract requiring the payment by the Navy of the three percent of the total contract price, mentioned above, at any time prior to final settlement, but *277 it is provided in Article 5(d) that the Navy may, in its discretion, make payments prior to final settlement on account of the reserves established under Article 5 of the Special Provisions, namely, the two percent performance reserve, and the one percent reserve for final settlement. Final settlement, as it is provided in the contract, is the event whereby the contractor is to receive payment of all unpaid amounts owed to it by the Navy, and whereby the contractor, in turn, is required to execute a release which frees the Navy from all obligations, liabilities, and claims arising under the contract. The contract provides that before final settlement, the contractor must satisfy certain requirements. First, as previously noted, the contractor, after completing the construction of each vessel, must test each vessel under certain applicable trial requirements and then deliver the vessel to the Navy at the Mare Island Naval Shipyard, Vallejo, Calif. Next, each delivered vessel is to be put through final trials by the Navy at its own expense during a three-month period conmmencing on the date of preliminary acceptance. Upon the expiration of the three-month guaranty period (i.e., the trial *278 period) each vessel is finally accepted by the Navy if it is found by the Chief of the Bureau of Ships to have 205 been constructed in conformity with the plans and specifications. The contract provides for final settlement under Article 19, General Provisions, upon the successful conclusion of the foregoing events for all three minesweepers to be constructed under the contract. The contract specifically provides, Article 19, General Provisions, that "Upon final acceptance of the vessels, * * *, the Contractor shall be entitled to receive the balance owing to it under this contract, such payment to be made promptly after the amount of such balance shall have been determined." Stephens Brothers reported its income for income tax purposes on the basis of a fiscal year beginning on November 1 and ending on October 31, but as a result of its liquidation on October 4, 1960, Stephens Brothers' final fiscal year began November 1, 1959, and ended October 4, 1960. Stephens Brothers had built a number of vessels for the Navy before it began to construct the three minesweepers under the contract in issue, and it had generally employed the completed contract method of reporting income with respect *279 to the previous contracts. With respect to the contract involved in this case, Stephens Brothers also employed the completed contract method of reporting income, but the method was actually a hybrid, or modified, form of the completed contract method as will be described subsequently. The minesweeper contract provides for the delivery of each of the three vessels by Stephens Brothers to the Navy in the calendar year 1959. The delivery of each of the three vessels was also to be within Stephens Brothers' fiscal year ended October 31, 1959. However, the three coastal minesweepers, MSC 281, MSC 282, and MSC 283, were different from previous minesweepers built by Stephens Brothers for the Navy, because changes in the specifications for MSC 281, MSC 282, and MSC 283 were different from the specifications for minesweepers built earlier by Stephens Brothers for the Navy, and because of highly specialized equipment required to be installed in the three minesweepers involved here. As a result of these differences, and due to complications in the construction of the three vessels, the completion and delivery of each vessel was delayed until after dates originally contemplated in the contract. *280 In addition, these complications gave rise to several claims which Stephens Brothers presented to the Navy, which will be described subsequently. MSC 281 was completed, delivered, and preliminarily accepted (as that term is understood under Article 5 of the General Provisions) in Stephens Brothers' fiscal year ended October 31, 1959. However, the guaranty period on MSC 281 had not expired, and MSC 281 was not finally accepted (as that term is understood under Article 7, General Provisions) until Stephens Brothers' final fiscal year ended October 4, 1960. MSC 282 and MSC 283 were not completed, delivered, and preliminarily accepted until during the fiscal year ended October 4, 1960 (as opposed to MSC 281 which was preliminarily accepted in fiscal year 1959). The expiration of the guaranty period and the final acceptance of MSC 282 and MSC 283 also occurred during the fiscal year of Stephens Brothers ended October 4, 1960. Final acceptance was given by the Chief of the Bureau of Ships to all three minesweepers involved here within the final fiscal year of Stephens Brothers ended October 4, 1960, prior to Stephens Brothers' liquidation. The parties have stipulated that in all material *281 respects the activities of Stephens Brothers, and the activities of the United States Navy, were in accordance with the requirements set forth in the contract for the three minesweepers with respect to billing, the making of progress payments, and the retentions by the Navy of the amounts required, or allowed, to be withheld under the terms of the contract. Stephens Brothers billed the Navy periodically on the basis of certified invoices certifying costs incurred in the performance of the contract as a whole. The periodic payments were made by the Navy to Stephens Brothers on the basis of the certified invoices submitted by Stephens Brothers by paying 90 percent of an amount determined by applying the percentage of the physical progress in the performance of the contract to the total contract price. The total contract price, for the purpose of determining the amount of the periodic payments to be made by the Navy to Stephens Brothers, was the original total contract price as adjusted for change orders in accordance with the "changes" provision, Article 4, General Provisions. The original total contract price for all three minesweepers was $5,394,407.86. Change orders within the meaning *282 of Article 4, General Provisions resulted in increased costs of $4,362 which were recognized and allowed by the Navy, and which resulted 206 in an upward adjustment of the total contract price by $4,362, or a total contract price of $5,398,769.86 as of October 4, 1960. Billings, progress payments, and retentions on the contract were determined and made on the basis of this adjusted contract price of $5,398,769.86, which, in accordance with Article 5(b), Special Provisions, did not include any adjustments resulting under Article 7, Special Provisions, relating to possible price adjustments for labor and material costs. Stephens Brothers billed the Navy for the total adjusted contract price for minesweeper MSC 281 prior to October 31, 1959, the last day of Stephens Brothers' 1959 fiscal year. MSC 281 was preliminarily accepted by the Navy in Stephens Brothers' fiscal year ended October 31, 1959, and, therefore, in accordance with Article 5(b), Special Provisions, Stephens Brothers was entitled to receive all amounts of the contract price for MSC 281 in excess of three percent of the total contract price as adjusted for "changes". Stephens Brothers, in accordance with Article 5(b), Special *283 Provisions, was not entitled at the time of the preliminary acceptance of MSC 281 to the three percent of the total contract price, consisting of a two percent performance reserve and a one percent reserve for final settlement. Stephens Brothers, in reporting its income for its fiscal year ended October 31, 1959, included 97 percent of the total contract price for MSC 281 in its income for that fiscal year (the amount which Stephens Brothers was entitled to under the contract in its fiscal year 1959 as a result of the fact that MSC 281 was preliminarily accepted in that year). Stephens Brothers also reported 100 percent of the costs incurred in the construction of MSC 281 in its return for its fiscal year ended October 31, 1959. When MSC 281 was finally accepted by the Navy, during Stephens Brothers' final fiscal year ended October 4, 1960, the Navy paid Stephens Brothers the two percent performance reserve, with the exception of $6,000 which the Navy continued to retain, together with the one percent reserve retained for final settlement. The payment of the two percent performance reserve on MSC 281, with the exception of the $6,000 retained by the Navy, was made on about January *284 4, 1960, and Stephens Brothers included and reported the amount of $29,991.80 in its income for its fiscal year ended October 4, 1960. MSC 282 and 283 were preliminarily and finally accepted by the Navy during Stephens Brothers' fiscal year ended October 4, 1960, and as of October 4, 1960, Stephens Brothers had billed the Navy for the total contract price, as adjusted for "changes", of each of the two vessels. By October 4, 1960, Stephens Brothers had been paid 99 percent of the total contract price, as adjusted for "changes", which included payment of the two percent performance reserves on each of the vessels MSC 282 and 283. The one percent reserve for final settlement on each vessel was retained by the Navy. On the basis of the payments received, Stephens Brothers, in reporting its income for its fiscal year ended October 4, 1960, included 99 percent of the total contract price, as adjusted for "changes" for MSC 282, $1,781,594.05, and 99 percent of the total contract price, as adjusted for "changes", for MSC 283, $1,781,594.05, in its income for its final fiscal year. Stephens Brothers also reported 100 percent of the costs incurred in the construction of MSC 282 and 283 in its *285 return for its fiscal year ended October 4, 1960. By October 4, 1960, Stephens Brothers had billed the Navy for the total contract price, as adjusted for "changes", in the amount of $5,398,769.86 for all three mine-sweepers. The Navy had paid all of the amounts billed (i.e., all of the total contract price as adjusted for "changes") with the exception of $59,987.70, namely the amount of $5,338,782.16. The $59,987.70 was retained by the Navy, and was not paid by the Navy, until the final settlement which occurred on May 15, 1964. The date of the final settlement, May 15, 1964, was long after the date of liquidation of Stephens Brothers. Therefore, the payments made by the Navy at final settlement were made to Stephens Marine, Inc., the petitioner herein, and the transferee of all the assets and liabilities of Stephens Brothers by virtue of the section 334(b)(2) liquidation. The $59,987.70 retained by the Navy until the final settlement date consisted of (1) one percent of the total contract price, as adjusted for "changes", $53,987.70, and (2) $6,000 retained by the Navy out of the two percent performance reserve for MSC 281. Stephens Brothers did not include and report the $59,987.70 *286 in its income for its fiscal year ended October 4, 1960. Petitioner, for Stephens Brothers, has conceded that the $6,000 retained by the Navy out of the two percent performance reserve on MSC 281, and eventually received by Stephens Marine, Inc., on May 15, 1964, at the time of final settlement, should have 207 been included in the income of Stephens Brothers for its fiscal year ended October 4, 1960; and that the $6,000 is properly includable in the income for that taxable year. Stephens Brothers employed a modified, or hybrid, completed-contract method of accounting for both bookkeeping and income tax purposes to report the income and expenses of this long-term construction contract. Stephens Brothers did not report all the income and all the expenses resulting from the minesweeper contract No. 3931 in one taxable year. Part of the income and expenses resulting from the contract was reported in Stephens Brothers' return for its fiscal taxable year ended October 31, 1959; and part of the income and expenses resulting from the minesweeper contract was reported in Stephens Brothers' return for its fiscal year ended October 4, 1960; still another part of the income (but not expenses) *287 resulting from the minesweeper contract, namely, $59,987.70, was not reported in income of Stephens Brothers for its fiscal taxable years 1959, 1960, or any other fiscal taxable year. The minesweeper contract provided for completion, delivery, and final acceptance of all three minesweepers in 1959, within Stephens Brothers' fiscal taxable year ended October 31, 1959. If construction of the three vessels had gone according to schedule, then Stephens Brothers could have reported all income and all expenses from the contract in one taxable year. However, complications in the construction process caused delays, with the result that only MSC 281 was completed and delivered to the Navy in Stephens Brothers fiscal year ended October 31, 1959, the vessel being preliminarily accepted by the Navy in Stephens Brothers' fiscal year ended October 31, 1959, but not finally accepted by the Navy until the subsequent fiscal year of Stephens Brothers, ended October 4, 1960. Consequently, Stephens Brothers adopted a modified or hybrid form of the completed contract method by reporting 97 percent of the income and 100 percent of the expenses for MSC 281 in its fiscal year ended October 31, 1959 (as has *288 been described above); and then reporting 99 percent of the income and 100 percent of the expenses for MSC 282 and for MSC 283 in Stephens Brothers' fiscal year ended October 4, 1960 (as has been described above). The use by Stephens Brothers of the hybrid or modified completed-contract method of reporting income and expenses from the minesweeper contract had not been questioned by the respondent. However, the respondent does question Stephens Brothers' alleged error in not including and reporting in its income for either its fiscal year ended October 31, 1959, or its fiscal year ended October 4, 1960, the $59,987.70 (of which $53,987.70 is still in issue) retained by the Navy until final settlement, even though all three minesweepers had been completed, delivered, and finally accepted by the Navy prior to the end of Stephens Brothers' fiscal year ended October 4, 1960. With respect to the minesweeper contract involved herein, Stephens Brothers' accounting entries for both bookkeeping and income tax purposes were made in the following manner. Stephens Brothers billed the Navy periodically (approximately semimonthly or more often) upon the submission by Stephens Brothers of invoices *289 which certified the costs incurred, and the percentage of physical progress in the performance of the contract as a whole. The amount of each billing by Stephens Brothers was determined by applying the percentage of physical progress in the performance of the contract to the total contract price as adjusted for "changes". When the certified invoice was approved by the Navy, the Navy paid 90 percent of the amount billed, and retained 10 percent. Ninety percent of the billing would be debited to Account 20, entitled Progress Billings Receivable, which was the amount currently payable by the Government out of the total amount billed. The other 10 percent withheld by the Government would be debited to another account receivable, Account 25, entitled Retentions on the Contract. The sum of these two debits was offset by a credit to Account 45, entitled Progress Billings Credit Account, which was a deferred income account. As the progress payments were paid, a debit would be entered in a cash account in the amount of the cash received, with a corresponding credit to Account 20, Progress Billings Receivable. When MSC 281 was preliminarily accepted in Stephens Brothers' fiscal year ended October *290 31, 1959, 97 percent of the total adjusted contract price of that vessel was included in income for that year. To account for this treatment, Stephens Brothers debited Account 45, Progress Billings Credit Account, for the total adjusted contract price for MSC 281. Ninety-seven percent of the offsetting credits was credited to Account 208, entitled Income-Government 208 Vessels, and the remaining three percent was credited to Account 165, entitled Deferred Income-Completed Government Vessels. When MSC 281 was finally accepted in the fiscal year ended October 4, 1960, the Navy paid the two percent performance reserve with the exception of $6,000. Stephens Brothers accounted for this by debiting Account 165, Deferred Income-Completed Government Vessels, in the amount of the performance reserve paid, and credited Account 208, Income-Government Vessels, with the same amount. Therefore, as of October 4, 1960, all billings on MSC 281 were credited to Account 208, with the exception of the one percent reserve for final settlement and the $6,000 withheld by the Navy, which were carried as credits in Account 165. Also, as of October 4, 1960, all billings for MSC 282 and MSC 283 were credited *291 to Account 208, with the exception of the one percent reserve for final settlement, which was carried as a credit in Account 165. As of October 4, 1960, Stephens Brothers, Incorporated, carried on its books, in asset account No. 25, "Retentions on the Contracts", and in a deferred income account, No. 165, "Deferred Income, Completed Government Vessels", the sum of $59,987.70, mentioned above. As of October 4, 1960, there was a debit balance on Stephens Brothers' books of $66,295.14 in account No. 25, "Retentions on the Contracts", which included the aforesaid $59,987.70. Stephens Marine, Inc., the petitioner, successor in interest to Stephens Brothers, Incorporated, upon acquiring the business, assets, and liabilities of Stephens Brothers as of October 4, 1960, carried over to its own books and accounting records, to its own account No. 1150, the aforesaid debit balance of $66,295.14 (from account No. 25), without any reduction in amount, and without the use of a reserve to indicate any lesser value. Stephens Marine, Inc., upon acquiring the assets of Stephens Brothers, did not establish on its books, as deferred income, the aforesaid $59,987.70, which had been carried on the books *292 of Stephens Brothers in account No. 165, Deferred Income-Completed Government Vessels, prior to and as of the date of liquidation. At the time of the trial of this case, Stephens Marine, petitioner, had not taken into, and reported as, income for any taxable period the aforesaid sum of $59,987.70. Also, Stephens Brothers, Incorporated, had not done so. Issue 2: Receipt in Fiscal 1960 of $57,539.33, Escalated Labor Cost Adjustment In addition to the billings on the total adjusted contract price, Stephens Brothers also billed the Navy for increased costs of labor prior to October 4, 1960. Based on a preliminary determination under Article 7 of the Special Provisions of the contract, the Navy authorized and paid Stephens Brothers, on January 27, 1960, $57,539.33 for increased labor costs (also called labor escalation). This preliminary determination and payment was based on data submitted by Stephens Brothers in its final fiscal year. The $57,539.33, billed and received on January 27, 1960, was subject to being repaid if the Navy, after audit and final determination, decided that Stephens Brothers was not entitled to the adjustment. However, Stephens Brothers deposited the $57,539.33 *293 in its general bank account, without any restrictions on the use of that money, even though there was a possibility that the Navy might, upon a later, final audit, require Stephens Brothers to refund all or some of that payment if it was determined later (which did not happen) that Stephens Brothers was not entitled to keep all or part of the payment in January 1960 of $57,539.33. Stephens Brothers accounted for the billing and receipt of the $57,539.33 in its final fiscal year in the following manner: Upon billing the Government, Account 20 was debited in the amount of $57,539.33. There was an offsetting credit in the same amount to Account 45, Progress Billings Credit Account. When payment was received prior to October 4, 1960, a debit was entered in the cash account in the amount of $57,539.33, with an offsetting credit to Account 20. Stephens Brothers included the $57,539.33 in its income, and on its tax return, for its final fiscal year ended October 4, 1960. In so doing, Stephens Brothers credited Account 208 in the amount of $57,539.33, with an offsetting debit to Account 45. The effect of billing the United States Navy for the $57,539.33 for labor costs adjustments in 1960 *294 was to increase total billings as of October 4, 1960, under the contract, from $5,398,769.86 to $5,456,309.19. As of the liquidation date, October 4, 1960, $5,396,321.49 had been recognized and 209 reported as income by Stephens Brothers either in its fiscal year ending in 1959 or in 1960. The adjusted contract price of $5,398,769.86 did not include the amount of $57,539.33, paid by the Navy on January 27, 1960, based on the preliminary determination by the Navy of the escalated or increased labor costs. However, addition of $57,539.33 to $5,398,769.86 results in total billings of Stephens Brothers to the Navy prior to October 4, 1960, in the total sum of $5,456,309.19, as stated above. The difference between the $5,456,309.19 billed and the $5,396,321.49, reported in and recognized as income, is $59,987.70 (see Issue 1, supra), the amount not recognized by the petitioner here as income for the final fiscal year of Stephens Brothers, carried in Account 165, Deferred Income, Completed Government Vessels. In the late summer of 1960, Theodore and Richard Stephens determined that the index provided in Article 7 of the "Special Provisions" of the Navy contract did not equitably reflect *295 the increased costs that Stephens Brothers was experiencing, or had experienced, in the construction of the three minesweepers. This index, in Article 7 of the "Special Provisions" of the contract, was a composite national index based on straight-time average hourly earnings for selected shipyards in the United States. Stephens Brothers believed an index based on straight-time average hourly earnings for selected shipyards along the Pacific Coast would more accurately reflect the increased costs for labor. Consequently, prior to its liquidation, Stephens Brothers directed its accountant to develop what Stephens Brothers has termed the "Pacific Area Index" of labor costs, and to compute its labor costs according to such "Pacific Area index". On about July 15, 1960, the accountant, Wilhelm, began work on a computation of the escalated labor costs of Stephens Brothers based on a so-called "Pacific Area Index" of costs. On October 21, 1960, after the liquidation of Stephens Brothers, Incorporated, and after the end of its last fiscal year ended October 4, 1960, Richard Stephens, for Stephens Marine, filed a claim with the Navy for a price adjustment of the minesweeper contract for escalated *296 or increased labor costs in the total amount of $116,095.86, of which total sum he acknowledged Stephens Brothers' receipt of an interim payment of $57,539.33 (described above). The amount of $116,095.86 was based on the alleged Pacific area index. This claim was made in accordance with Article 7, subparagraph (e) of the Navy contract which provided that the Navy could substitute another index for the original index provided under the terms of the contract if it felt that the new index would more accurately reflect the changes in labor costs. Before the Navy passed on the claim submitted, an audit was made to determine the costs actually incurred by Stephens Brothers in its preformance under the contract. In the spring of 1961, personnel of the Navy's Contract Audit Division made an initial audit of Stephens Brothers' costs. On May 29, 1961, subsequent to the audit, the Navy denied petitioner's claim, noting that it was based on the Pacific Area Index rather than on the composite national index provided for in the contract. The Navy advised Stephens Brothers Marine that its claims for labor and material "escalation" (cost increases) should be made in strict compliance with the terms *297 of the minesweeper contract. In addition, the Navy stated, in respect to a claim of Stephens Brothers under Change Order No. 3029, that the Navy still was of the opinion that the change order should be priced out at no change. Subsequently, on July 16, 1962, Stephens Marine, Inc., resubmitted to the Navy a claim for escalated or increased labor costs in the revised and reduced total amount of $115,207.44, which also was computed on the basis of the so-called Pacific area index. The reduction in the claim from the earlier amount of $116,095.86 was due to minor adjustments which are not relevant here. Negotiations concerning this claim for increased labor costs continued for close to three years. On January 3, 1964, the Navy and Stephens Marine entered into an agreement wherein the parties settled the claim. The parties agreed to substitute Stephens Brothers' actual increase in labor costs, namely, $91,443.21, for any labor escalation determined under the composite national index provided for in Article 7 of the Special Provisions of the minesweeper contract. In addition, the parties agreed to a material adjustment, under Article 7 of the Special Provisions of the contract, which resulted *298 in a decrease of $10,409.55 in costs of materials; and the parties agreed to equitably adjust Change Order No. 3029 at no change in the contract price. Stephens Marine, Inc., accepted the agreed amount of $91,443.21, for increased labor costs, under the settlement of January 3, 1964. The difference between the claim for $115,207.44, and $91,443.21, or $23,764.23, which the Navy did not allow, represented 210 mainly a cost for vacation pay, which the Navy concluded was not contemplated or allowable under the adjustments provision of the Navy contract. In the Navy letter of January 3, 1964, entitled "Supplemental Agreement, Modification No. 8", the net amount allowed was $81,033.66, which was the final determination of the Navy provided for in Article 7, subparagraph (e) of the Special Provisions of the contract. By virtue of the price adjustment under Modification No. 8, the total contract price, on this date, was increased by $81,033.66, a net figure for the increase for adjusted labor costs of $91,443.21, less the decrease for adjusted material costs of $10,409.55. Under the terms of the settlement, Stephens Marine also agreed that no compensation would be received for alleged increased *299 costs resulting from Change Order No. 3029. Change Order No. 3029 was a revised list of stock repair parts which the contractor was required to furnish for the three minesweepers. The amount of this claim was $12,816. At some time prior to its liquidation on October 4, 1960, and in addition to the claims described above, Stephens Brothers had filed one other claim with the Navy under the contract in the amount of $12,816, relating to Change Order No. 3029. However, since Stephens Marine, Inc., agreed to waive, or give up, this claim, it in effect agreed to bear those costs. Out of the net amount of $81,033.66. allowed, $57,539.33 had been paid by the Navy to Stephens Brothers prior to October 4, 1960, leaving a balance of $23,494.33, which was paid by the Navy at the time of the final settlement, which was on May 15, 1964. The petitioner, Stephens Marine, had several claims against the Navy, in addition to the claim for increased labor costs, resulting from problems which arose in the course of the construction of the three minesweepers. One claim for $1,240.83, filed after November 9, 1960, was based on escalation of material costs on a subcontract with Allis Chalmers. That claim *300 was paid by the Navy on May 8, 1962. Another claim in the amount of $10,971.36, for additional specialized material required by the Government after the contract was in progress, was paid by the Navy on February 9, 1961. These extra materials were not contemplated by the original contract, and the contract price was accordingly increased by $10,971.36. A third claim, filed on August 10, 1960, was for financial relief under Public Law 85-804, and sections 17-207.2 and 17-207.4 of the Armed Services Procurement Regulations. This claim, in the amount of $106,547, was for the alleged failure of the contract language to express the intent of the parties. Public Law 85-804 provided relief in such circumstances to contractors who, if not compensated, would be forced to discontinue Government contract work. This claim did not arise under the terms of the minesweeper contract and consequently there were no provisions in the contract itself which provided relief. A letter to petitioner, Stephens Marine, from the Navy, dated February 5, 1962, described the nature of this claim. The letter stated: "However, since this claim does not arise under the contract but is a request for extraordinary financial *301 relief, it should be pointed out that disposition of this request will not necessarily delay final settlement of the contract." As a result, the Navy contracting officer allowed this claim under Public Law 85-804 to remain as an exception to the general release executed by Stephens Brothers' successor, Stephens Marine, Inc., on May 15, 1964. Negotiations of the claim for financial relief under Public Law 85-804 continued until April 20, 1966, when the Navy by virtue of the Amendment No. 9 paid Stephens Marine, Inc., $11,621 in settlement. Final settlement, provided for in Article 19 of the General Provisions of the minesweeper contract, was delayed, as a result of the various claims made by Stephens Brothers or by the petitioner, until May 15, 1964. Other than the downward adjustment for material costs included in Modification No. 8 on January 3, 1964, the Navy did not have any claims against Stephens Brothers or Stephens Marine. As of May 15, 1964, all of the claims arising under the terms of the contract had been settled by the parties. The only claims remaining at the time of the final settlement were claims which arose outside the terms of the minesweeper contract. They included *302 the claim under Public Law 85-804 for financial relief, and certain claims based on patents held first by Stephens Brothers, and later by Stephens Marine. At the final settlement, there were only two matters to be taken into account in determining the balance owing to Stephens Marine, Inc., the items of $59,987.70 which had been withheld by the Navy pending final settlement (of 211 which $53,987.70 is in issue here, Issue 1); and the $23,494.33 (out of the $81,033.66) which had not yet been paid for labor and material costs adjustments (Issue 2). There was another, $7,782.44 (which has not been explained in the record here) which was paid at the final settlement. On January 30, 1964, Stephens Marine executed the release required in the contract, discharging the Navy from all claims, obligations, and liabilities not accepted by the Navy. The parties here have stipulated that the total contract price as of January 30, 1964, after all adjustments had been made, but not including the adjustment made for relief payments under Public Law 85-804, was $5,490,774.88. The recovery of $11,621 on April 20, 1966, for financial relief under Public Law 85-804, increased the total adjusted contract *303 price to $5,502,395.88. (It appears that the correct figures are, however, $5,490,774.68 and $5,502,395.68.) The increase from the original contract price of $5,394,407.86 is explained by the following summary: Original contract price
$5,394,407.86
Amendment No. 4
57,539.33
Amendment No. 7
10,971.36
Amendment No. 8
23,494.33
Change orders 4,362.00
Total (January 30, 1964)
$5,490,774.88
Relief under Public Law 85-804
11,621.00
Total
$5,502,395.88
The billings under the contract, as well as the amount recognized as income by the petitioner for its final fiscal year ended October 4, 1960, were as follows: Billings as of October 4, 1960:
Contract (original)
$5,394,407.86
Change orders
4,362.00
Labor and material adjustments 57,539.33
Total billings, October 4, 1960
$5,456,309.19
Less retentions 59,987.70
Income recognized (October 4, 1960)
$5,396,321.49
Amendment No. 7 (February 9, 1961)
Final settlement (May 15, 1964):
Withholdings $59,987.70
Labor and materials 23,494.33
83,482.03
Total (January 30, 1954)
$5,490,774.88
Relief under Public Law 85-804 (April 20, 1966) 11,621.00
Total
$5,502,395.88
Issue 3: Pleasure Craft Business of Stephens Brothers Another part of the business of Stephens Brothers was the construction *304 of pleasure craft, boats and yachts of a fairly large size, usually from 45 to 80 feet long, operated by either gasoline or diesel engines, priced at from $35,000 to $100,000, or more. The time for the construction of one of such boats was usually from four to six months, and Stephens Brothers ordinarily constructed from 10 to 12 of such boats in a year. Stephens Brothers constructed two classes of such boats, namely, under contracts with private purchasers, according to specifications, or for Stephens Brothers' own inventory, for retail sale. However, all boats were built according to Stephens Brothers' own general designs. During its last fiscal year, and as of October 4, 1960, Stephens Brothers had eight pleasure boats under construction, the construction of which had not been completed by October 4, 1960, namely, the following boats, some of which were being built under specific contracts with private buyers, whereas others were being built for Stephens Brothers' own inventory for sale, as shown in the following list: Uncompleted Hulls
Type of Work
1. M 46
Specific contract
2. M 61
Specific contract
3. M 69
Specific contract
4. M 70
Specific contract
5. M 72
Specific contract
6. M 63
S. Bros. own inventory
7. M 73
S. Bros. own inventory
8. M 76
S. Bros. own inventory
*305 Stephens Brothers had its own drafting and designing department, where a plan for a new boat was made, and before entering into a contract for a boat with a prospective private purchaser, Stephens Brothers would draw up the plan for the boat incorporating the specifications and wishes of the private purchaser. Prior to executing the contract for a buyer's order for a boat, the buyer would indicate his ideas about various specifications, such as size, speed, equipment, and accessories; then Stephens Brothers' employees would make drafts of the plan and specifications, and finally the contract would be prepared, and signed by the parties. The general form of Stephens Brothers' contract for the construction of a boat for a customer included the following: That Stephens Brothers would build and deliver a boat in accordance with the custom design and specifications attached to and made part of the contract; that title to the boat would remain in Stephens Brothers until the entire contract price had been paid by the purchaser; and that payments of the contract price would be made at stated intervals. 212 With respect to the payments of the contract price, 25 percent of the total price was *306 to be paid by the purchaser upon entering into the contract; an additional 25 percent thereof was to be paid when the hull was planked; an additional 25 percent was to be paid when the engine was installed; and the final 25 percent of the contract price was to be paid upon the completion of the boat. The contract payments, as indicated above, were not made on the basis of a percentage, of completed construction work; i.e., 25 percent thereof was paid when the contract was executed. In some contracts, payments were to be made in two or three installments, instead of four. Paragraph Fifth of Stephens Brothers' standard form of contract for the construction of pleasure boats provided as follows: It is understood and agreed that title to said… shall remain vested in said Contractor until the entire sum of… Dollars shall have been fully paid. In the event of a default either in payment of interest or principal as herein agreed, Contractor is hereby given the right to take possession of said boat and all equipment and all payments made by Purchaser shall be forfeited to said Contractor as liquidated damages. During its last fiscal year ending on October 4, 1960, Stephens Brothers received *307 cash payments under the contracts for the construction of the five boats, known as hulls Nos. 46, 61, 69, 70, and 72, in the total sum of $115,467. as follows: Hull
Cash Payments Rec'd
No. 46
$37,500
No. 61
29,729
No. 69
9,038
No. 70
30,000
No. 72 9,200
Total
$115,467
In addition, as was customary, Stephens Brothers had received a trade-in of an old boat of a customer, as a credit or partial payment, as of October 4, 1960, in the amount of $20,300, so that it had received $135,767 under the contracts, as of October 4, 1960, for the above-listed boats (hulls) consisting of the cash payments of $115,467, and the trade-in allowance, or credit, of $20,300. The trade-in credit of $20,300 was for the old boat of the customer who had contracted to purchase hull No. 72. Under the contract for hull No. 61, Stephens Brothers, prior to October 4, 1960, had accepted a trade-in of a boat and had credited the customer with a trade-in value of $22,955, as a credit to the total contract price of $55,968. However, when Stephens Brothers sold the boat received as a trade-in, it received only $17,000. On its books, Stephens Brothers included the $17,000 in the cash payments of $29,729 received under the contract *308 for hull No. 61, as of October 4, 1960. When Stephens Brothers took a customer's old boat as a trade-in, under a contract, a purchase agreement was executed, which was made a part of the contract. It was provided in such purchase agreement that the customer, who had traded in his old boat under the contract for the new boat, would retain the record-ownership and the possession of the old boat, would assume the obligations of maintenance and of normal ownership, and would maintain insurance on the old boat until the sale thereof. On the other hand, under the provisions of the agreement to purchase the old, trade-in boat, Stephens Brothers agreed to reimburse its customer (the owner of the old boat) for the cost of the insurance from the date of the agreement to purchase the trade-in boat. Under the agreement to purchase the trade-in boat, either party could sell the trade-in boat; and if it was sold for more than the trade-in allowance given by Stephens Brothers, then the excess was to be retained by, or paid over to, the customer who had entered into the trade-in agreement. The standard form of Stephens Brothers' contract for the construction of the pleasure craft, which was executed *309 for the building of hulls Nos. 46, 61, 69, 70, and 72, was entitled, "Agreement for Purchase"; and each contract provided that the specified payments to be made were "in consideration" for the construction and delivery of the boat. Under the terms of each contract for the building of the five boats, referred to above, Stephens Brothers was entitled to keep the payments received at the times of the payments, and it had an unconditional right to each payment received, when each one was received. The payments, in each instance, were advance payments, or partial payments, made in consideration for a boat which was to be completed and delivered in the future. In each contract it was provided that if the purchaser defaulted in making the payments required, then Stephens Brothers would be entitled to keep the partial payments of the total purchase price, which already had been received, as well as the boat under construction or constructed, and all of the boat's equipment. In their stipulations of 213 facts, the parties described such payments, which Stephens Brothers had received in its final fiscal year ended October 4, 1960, as "advance payments", not "advances". Stephens Brothers deposited *310 the payments it received under each contract in its general bank account. In the contracts, there were not any restrictions on Stephens Brothers' use of any of the payments; there were not any requirements that the payments should be segregated by Stephens Brothers from any of its funds; or that the payments should be used, under the contract, only for materials and labor for the boat being built under the contract. The payments received by Stephens Brothers during its final fiscal year under the contracts to build hulls Nos. 46, 61, 69, 70, and 72, totaling cash payments of $115,467, plus the trade-in credit of $20,300 on hull No. 72, or $135,767, were not loans to Stephens Brothers. During its final fiscal year, as of October 4, 1960, Stephens Brothers had incurred, under the contracts to build hulls Nos. 46, 61, 69, 70, and 72, material and labor costs totaling $84,560, and it had received in cash payments and the trade-in credit $135,767, which sum exceeded the above costs by $51,207. Under the contracts, possession of and title to each boat remained in Stephens Brothers until the completion of the boat and the receipt of the final payment. The balance of the contract price became *311 due upon completion of the boat (not upon delivery). In the event of default by the purchaser, under a contract, Stephens Brothers was to retain all of the payments received from the purchaser. The method of accounting used by Stephens Brothers for the construction of private hulls under construction contracts was a completed contract method of accounting. At no time in accounting (on its books and tax returns) for its performance under the construction contracts did Stephens Brothers take into income the partial payments received, to which it was entitled because of part performance under the contract. It was not until the time (taxable year) that a construction contract was closed that Stephens Brothers reported any income from the contract. Also, Stephens Brothers did not deduct (for tax purposes) any of the expenses incurred in constructing the boat until the year in which the contract was closed, at which time the amount in Account 31, Work in Progress, New Construction, was charged out as costs of sales. On the other hand, under the contracts involved here, Stephens Brothers became entitled to receive a fixed amount of the contract price when certain steps in the construction *312 occurred, such as, for example, when the hull was planked. When such steps in the progress of construction occurred, the right of Stephens Brothers to a stated amount of the contract price became fixed. The entries on Stephens Brothers' books were made in the following manner: When a payment was received, pursuant to the terms of a contract, the amount received was credited to Account 102, called "Customers Deposits," which was a deferred income account. The debit entry was to a cash account. When the work was completed on a boat, Account 15, "Accounts Receivable," was debited for the full purchase price; the credit was to an income account. Thereafter, a debit was entered in Account 102, Customers Deposits, with an offsetting credit to Account 15, Accounts Receivable, for the amount of the purchase price, thereby closing out the account. Labor and materials costs for the construction of a boat under a contract were charged to Account 31, Work in Progress, New Construction. When a particular job was closed out, the amount in Account 31 was charged out as cost of goods sold. As of October 4, 1960, work was not near completion on any of the five hulls built pursuant to specific orders, *313 in issue here, and none of the payments received in the construction of these boats, and none of the costs incurred, were reported by Stephens Brothers in any income tax return prior to its liquidation on October 4, 1960. The amount of work completed, computed on the basis of the amount of costs incurred up to October 4, 1960, expressed as a percentage of the total cost of each boat, show the following ratios of material and labor costs incurred up to October 4, 1960, to the total of such costs for each boat: Ratio of costs incurred
Hull
to total costs
No. 46
48.25%
No. 61
10.56%
No. 69
72.09%
No. 70
65.19%
No. 72
45.24% For example: As of October 4, 1960, 48.25 percent of the total labor and materials costs for hull No. 46 had been incurred by 214 Stephens Brothers. A weighted average of these ratios indicates that only 40.6 percent of the work on the five hulls had been completed by Stephens Brothers prior to its liquidation on October 4, 1960. The following schedule shows for the five hulls, the costs, percentage of work completed, final sales price, and payments received as of October 4, 1960: (1)
(2)
(3)
(4)
(5)
(6)
Cash Deposits
Material and
Total Mate-
Final Sales
(Advance Pay-
Hull
Labor Costs
rial and
(2) as a
Price (Con-
ments) Rec'd
No.
at 10-4-60
Labor Costs
% of (3)
tract Price)
as of 10-4-60
1. 46
$21,703
$ 44,980
48.25%
$ 58,494
$ 37,500
2. 61
4,263
40,353
10.56%
55,968
29,729
3. 69
23,036
31,953
72.09%
41,188
9,038
4. 70
18,792
28,826
65.19%
43,191
30,000
5. 72 16,766
37,064 45.24% 56,478
* *314 9,200
$84,560
$183,176
$255,319
$115,467
20,300
$135,767
The following schedule sets forth the total profit realized when each of the boats (or hulls) was completed, which was after October 4, 1960, and respondent's determination, as adjusted, of the profit realized by Stephens Brothers as of October 4, 1960, under his theory, attributing a percentage of the profits to Stephens Brothers, based on the percentage of work done on each boat in issue: Hull No.
Total Profit *
Profit to 10-4-60 per Respondent
1. 46
$13,514
$6,521
2. 61
15,615
1,647
3. 69
9,235
6,656
4. 70
14,365
9,364
5. 72 19,414
8,784
Total
$72,143
$32,972
Hull No. 46: Stephens Brothers contracted with Curtiss-Wright Corp. to construct hull No. 46. Curtiss-Wright was considering developing marine engines for pleasure craft, and contracted with Stephens Brothers to construct this hull to test the feasibility of entering this field. The hull was of very special design, which resulted from the fact that it was being built to accommodate the special marine engines Curtiss-Wright *315 was planning to develop. Stephens Brothers had accomplished all the work that was possible on the craft prior to installation of the engines before the end of its final fiscal year. However, during that fiscal year ended October 4, 1960, it became apparent that Curtiss-Wright could not furnish the engines, and Curtiss-Wright gave up the project. Negotiations were begun prior to October 4, 1960, between Curtiss-Wright and Stephens Brothers for termination of the contract, by J. Niccio, Vice President of Curtiss-Wright, at Stephens Brothers' plant in Stockton. During these negotiations prior to October 4, 1960, Curtiss-Wright made a proposal to terminate the contract. On October 6, 1960, Richard Stephens, acting for Stephens Marine, Inc., made a counter-offer for termination, which was accepted by Curtiss-Wright on October 18, 1960. Under the agreement to terminate the purchase contract for hull No. 46, Stephens Marine agreed to refund to Curtiss-Wright $22,000 out of the $37,500 which had been paid to Stephens Brothers under the contract prior to October 4, 1960, by Curtiss-Wright; and Stephens Marine retained $15,500 of the payments as well as title to and possession of hull No. 46 *316 Stephens Marine paid the $22,000 to Curtiss-Wright after the liquidation of Stephens Brothers, and Stephens Brothers did not pay the refund. Curtiss-Wright accepted the terms of the termination of the contract proposed by Stephens Marine in a letter dated October 18, 1960, which provided in part as follows: 3. The subject hull, in its incomplete state, shall be and remain the property of your Company, and in connection therewith the parties recognize and acknowledge that the title to said hull has at all times been vested in your Company, and that this agreement to terminate subject purchase order and to settle the rights of the parties in connection therewith does not constitute a sale of any property by 215 one party to another nor a transfer of title to any such property. Upon the termination of the contract with Curtiss-Wright on or about October 18, 1960, Stephens Marine completed hull No. 46, installed standard engines, made modifications in the construction, and put the boat in water. Thereafter, William Wright bought the boat from Stehens Marine for $58,494 in March 1961. The respondent determined (in the statutory deficiency notice) that during its final fiscal year there *317 had accrued to Stephens Brothers percentages of the total profit on each of the five boats (being built under contractorders) in the total sum of $37,735. He adjusted that total sum of the profit accrued as of October 4, 1960, to $32,972, under stipulations filed at the trial of this case. His adjusted computations are set forth in the schedules on page 33, supra. For convenience, parts of those schedules are again set forth below: % of Costs
Hull
Total
to 10/4/60
Profit to
No.
Profit
to Final Costs
10/4/60
46
$13,514
48.25%
$ 6,521
61
15,615
10.56%
1,647
69
9,235
72.09%
6,656
70
14,365
65.19%
9,364
72
19,414
45.24% 8,784
$32,972 He applied to the total profit on each boat the percentage ratios of the costs up to October 4, 1960, to the total costs, in order to compute the profit which had accrued and had been earned up to the end of the final fiscal year. Ultimate Findings of Fact 1. As of October 4, 1960, Stephens Brothers had a fixed and enforceable right to receive a reasonably ascertainable amount, namely the $59,987.70 withheld by the Navy, under Contract No. 3931 until final settlement. There was a fixed right to the $59,987.70 because as of October 4, 1960, there was no contingency existing, or reasonable *318 uncertainty, as to the ultimate payment of the $59,987.70; therefore, the $59,987.70 should have been included in income of Stephens Brothers for its fiscal year ended October 4, 1960. 2. The theoretical possibility of a downward adjustment of the contract price which could offset the amount retained by the Navy until final settlement, which existed by virtue of the contract provisions, did not create a contingency, or reasonable uncertainty, as to the ultimate payment of the $59,987.70. 3. The provision for substituting a new index to compute labor cost adjustments, in place of the index provided for in the contract, did not make the ultimate payment of the $59,987.70 contingent or reasonably uncertain. The requirement that Stephens Brothers, or its successor, should execute a release of all claims, and the requirement that all claims under the contract must be settled before the Navy would pay the $59,987.70, did not make the ultimate payment of that amount contingent or reasonably uncertain, as of October 4, 1960. 4. Petitioner has introduced no evidence to sustain a finding that there was, in fact, a contingency or a reasonable uncertainty as to the ultimate payment of the $59,987.70 *319 as of October 4, 1960. 5. All efforts and costs expended in the actual, physical construction of the three minesweepers were expended only by Stephens Brothers, and the $59,987.70 retained by the Navy, and ultimately paid on May 15, 1964, was earned by Stephens Brothers prior to its liquidation, and was not earned by Stephens Marine. 6. The $57,539.33 authorized and paid by the Navy to Stephens Brothers, on or about January 27, 1960, during Stephens Brothers' final fiscal year, ended October 4, 1960, was not a loan or a conditional advance in the nature of a loan. The payment of $57,539.33 was made as the result of a preliminary determination that Stephens Brothers was entitled to that amount, based on data submitted by Stephens Brothers of increased labor costs incurred in the construction of the three minesweepers. 7. There were no restrictions as to the use of the $57,539.33, received by Stephens Brothers in its fiscal year 1960, based on that corporation's claim for increased labor costs, and Stephens Brothers correctly accounted for the $57,539.33 by including that amount in its income for its fiscal year ended October 4, 1960. 8. As of October 4, 1960, Stephens Brothers' total *320 billings to the Navy in regard to the minesweeper contract were $5,456,309.19, which billings consisted of the following: (a) The original contract price
$5,394,407.86
(b) Adjustments for small change orders
4,362.00
(c) Labor escalation claim 57,539.33
Total billings
$5,456,309.19 216 Of the total billings, Stephens Brothers had included and reported in its income $5,396,321.49 as of October 4, 1960. The difference between total billings, $5,456,309.19, and the amount reported in income by Stephens Brothers as of October 4, 1960, $5,396,321.49, is $59,987.70. As stated previously, Stephens Brothers had a fixed and enforceable right to the $59,987.70 as of October 4, 1960, and it should have included the $59,987.70 in income for the fiscal year ended October 4, 1960. 9. Stephens Brothers employed a completed-contract method of accounting for both bookkeeping and income tax purposes with respect to the five contracts for the construction of the five boats. 10. In accordance with the terms of each of the contracts to construct pleasure craft, Stephens Brothers received payments totaling $135,767, in the fiscal year ended October 4, 1960, without restriction as to use; and by the terms of *321 each of the five contracts, Stephens Brothers was entitled to the payments at the time they were received. 11. The payments totaling $135,767 received in fiscal year 1960 by Stephens Brothers were not loans, or advances in the nature of loans. Rather, they were prepayments, partial payments, or advance payments received as consideration for the construction and delivery of each one of the five boats. 12. The prepayments, or partial payments, in the total amount of $135,767, received by Stephens Brothers in fiscal year 1960, under contracts for the construction of the five boats, which were unrestricted as to use, should have been included in the income of Stephens Brothers for the fiscal year ended October 4, 1960. 13. Negotiations for the termination of the contract with Curtiss-Wright for hull No. 46 had begun prior to October 4, 1960, but Curtiss-Wright did not accept the offer to terminate that contract until October 18, 1960. As of October 4, 1960, Stephens Brothers had received $37,500 in partial payments, or prepayments, from Curtiss-Wright for hull No. 46; and as of October 4, 1960, Stephens Brothers had not returned any of the payments to Curtiss-Wright, nor had it agreed *322 to return any of the payments it had received. Stephens Marine, not Stephens Brothers, returned $22,000, out of the $37,500 received for hull No. 46, at some time subsequent to the end of Stephens Brothers' final fiscal year ended October 4, 1960. Opinion Issue 1: Contract to Build Minesweepers. Respondent included in income for the final fiscal year of Stephens Brothers, ended October 4, 1960, the total sum of $59,987.70, which had been withheld by the Navy pending final settlement, which consisted of two items, $6,000 withheld under the two percent performance reserve for MSC 281, and $53,987.70 withheld as the one percent reserve pending final settlement. There remains in issue only the determination relating to $53,987.70, as petitioner has conceded that $6,000 is includable in income. Under the terms of the contract, the right to the two percent performance reserve was to arise at the time of final acceptance, upon satisfactory completion, and the expiration of the three-month guaranty period. Final acceptance of MSC 281 occurred during Stephens Brothers' final fiscal year, the taxable year. In its reply brief Stephens Marine stated as follows: It does not appear from the contract *323 that payment of this $6000 was contingent on anything except successful performance and expiration of the guarantee period on MSC 281. It has been stipulated that MSC 281 was fully accepted prior to October 4, 1960; and the $6000 was ultimately paid. Petitioner can speculate as to various reasons that the $6000 was withheld until 1964, but the record is barren of facts. Therefore, petitioner will not feel that a finding of taxability of the $6000 in fiscal 1960 is inconsistent with its view of the case. The basic issue is whether, under the modified completed contract method of reporting income, employed by Stephens Brothers, Stephens Brothers had acquired in the taxable year, with respect to $53,987.70, a fixed right to payments which had become definite in amount prior to October 4, 1960, so that it was obliged to include that sum in its income for the taxable year. In general, the petitioner, Stephens Marine, contends that the right to $53,987.70 had not become fixed during Stephens Brothers' taxable year ended October 4, 1960, and so was not includable in Stephens Brothers' income for its final fiscal year. Petitioner argues that there was the possibility that Stephens Brothers *324 would not receive part or all of the amounts withheld because the 217 contract, when read as a whole, is not a fixed price contract, since the total price could be adjusted upward or downward for costs of labor or materials, and as of October 4, 1960, those adjustments had not finally been determined, if any, so that there remained the possibility that the total contract price might be adjusted downward, which would reduce (if that happened) the amount that eventually would be paid over to petitioner or Stephens Brothers out of the reserve withheld, namely the $53,987.70. Petitioner contends further that there were other factors, as of Ocober 4, 1960, which made contingent the right to receive from the Navy money withheld under the reserve, and also made uncertain what amount of money would be determined to be payable out of the sums withheld in the reserve. Petitioner argues that those factors consisted of the Navy's final audit, and the possible adjustments, upward or downward, of costs of labor and materials if a different cost index should be substituted for the one designated in the Navy contract. Another factor indicating contingency is said to have consisted of the requirement *325 in the contract that Stephens Brothers, or its successor, must eventually execute a release in respect to all claims, or settle them. Respondent contends that Stephens Brothers was reporting income from this contract on the completed contract method, and he points out that the completed contract method of reporting income requires the reporting of all income and of all the expenses of a long-term contract at one time, in one taxable year. Respondent argues that Stephens Brothers had completed the work under the contract, that the right to the income had become fixed, and that therefore all the income in question, under the contract should be reported in the taxable year ended October 4, 1960. Respondent argues, also, that the possibility of an adjustment, resulting from a subsequent audit, is not such contingency as precludes the accrual in the taxable year of the amounts withheld, pending final settlement; and that any contingencies which would prevent accrual would have had to exist by the end of Stephens Brothers' taxable year, before deferral of income would be justified. Respondent contends that no such contingency existed as of October 4, 1960. The evidence shows that Stephens *326 Brothers employed a hybrid or modified form of the completed contract method of reporting income because rather than reporting all the income and all the costs arising from the contract in one fiscal year, Stephens Brothers chose to report the income and costs from one vessel in one year, and the income and costs from the other two vessels in a second year. Ninety-seven percent of the income and 100 percent of the costs incurred in constructing MSC 281 were reported in Stephens Brothers' fiscal year ended October 31, 1959. The remaining three percent of the income consisted of the two percent performance reserve and the one percent reserve for final settlement. All except $6,000 of the two percent performance reserve was paid by the Navy upon final acceptance in the fiscal year 1960, and was reported by Stephens Brothers in that year; and petitioner now concedes that the $6,000 also is includable in income of Stephens Brothers for the taxable year ended October 4, 1960. All but the one percent reserve for final settlement for MSC 282 and MSC 283 was reported by Stephens Brothers when these hulls were finally accepted in the fiscal year 1960. In addition, all the costs incurred in the *327 construction of MSC 282 and MSC 283 were reported by Stephens Brothers in the fiscal year 1960. Respondent argues that since all costs which had been incurred under the contract were accounted for and reported in the tax returns up to October 4, 1960, all income resulting from the contract also should have been reported by the final fiscal year of Stephens Brothers. In this regard, we do not believe the respondent's position is correct. The completed contract method is basically an accrual method of accounting. Jud Plumbing & Heating, Inc., 5 T.C. 127, affd. 153 F. 2d 681 (C.A. 5, 1946). Under an accrual method of accounting an item is includable in income when the taxpayer's right to receive it has become a fixed and enforceable right to receive a reasonably ascertainable amount. Security Flour Mills Co. v. Commissioner, 321 U.S. 281 (1944); Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184-185 (1934); Breeze Corporation, Inc. v. United States, 127 Ct. Cl. 261, 267 (1954). Generally, under the completed contract method, the right has become fixed and definite in amount upon completion and final acceptance of the construction work, and all amounts due the contractor are *328 includable in the year of final acceptance. The exception to this general rule requiring accrual is when there 218 is some contingency or reasonable uncertainty which prevents accrual. This exception, one of long standing, was succinctly stated in A. D. Irwin, 24 T.C. 722 (1955). In that case the taxpayer computed its income on the completed contract basis and the opinion stated the following, p. 727: Such method of accounting contemplated proper accrual of all unpaid billings, accounts receivable, and accounts payable in the year the contract is substantially completed, which in the instant case is 1938. V.J.H. Bien, 20 T.C. 49; Ehret-Day Co. 2 T.C. 25. The only exception to the rule requiring the accrual of outstanding items in the year of completion is made in the case of outstanding items which are "contingent and uncertain." National Contracting Co., 37 B.T.A. 689, 702, affd. (C.A. 8) 105 F. 2d 488; Edward J. Hudson 11 T.C. 1042, affd. (C.A. 5) 183 F. 2d 180. The question, therefore, is whether Stephens Brothers had a right to the $53,987.70 in issue and, if so, whether the right to that amount was subject to some contingency or reasonable uncertainty as of October 4, 1960, *329 which would prevent accrual of the item in that year. It is held that Stephens Brothers had a right to the $53,987.70, and that there did not exist a contingency or reasonable uncertainty as of October 4, 1960, sufficient to permit Stephens Brothers to defer reporting in its income for fiscal 1960 the amounts withheld by the Navy. Stephens Brothers' right to the $53,987.70 arose upon final acceptance. Article 19 of the General Provisions, entitled Final Settlement, sets forth the following: Upon final acceptance of the vessels, * * *, the Contractor shall be entitled to receive the balance owing to it under the Contract, such payment to be made promptly after the amount of such balance shall have been determined. Since final acceptance of all three minesweepers occurred in fiscal 1960, Stephens Brothers' right to the amounts owing, including the $53,987.70, arose in its final fiscal year ended October 4, 1960. The fact that the right to the one percent reserve for final settlement had accrued is further evidenced by Article 5 of the Special Provisions, entitled Payments. Under the payments provision of the contract Stephens Brothers was entitled to bill the Navy on the basis of the *330 amount of work performed. Of the amount billed, a certain percentage was retained by the Navy until further events occurred under the contract, at which time the payment of the amounts withheld would be made. The point to be made, however, is that generally a contractor is entitled to bill for amounts which have been earned. Here, Stephens Brothers had billed the Navy for the total adjusted contract price of $5,398,769.86, as of October 4, 1960, which included a billing for the one percent reserve for final settlement, $53,987.70. Furthermore, Stephens Brothers' own accounting records reflect the understanding that the amounts withheld by the Navy pending final settlement were earned and that Stephens Brothers had a right to these amounts. When Stephens Brothers billed the Navy, the amounts currently payable were debited by Stephens Brothers to its Account 20, Progress Billings Receivable. The balance of the billing, that portion retained by the Govenment, was debited to another account receivable, namely, Retentions on Contracts, Account 25. The one percent reserve for final settlement, $53,987.70, was held by Stephens Brothers in Account 25 prior to and as of October 4, 1960. The *331 fact that the amounts withheld were entered by Stephens Brothers in an account receivable, together with the other factors set forth above, compels us to conclude that Stephens Brothers had a right to the one percent reserve for final settlement in the fiscal taxable year ending October 4, 1960. Moreover, it is held that no contingency or reasonable uncertainty existed as of the end of Stephens Brothers' final fiscal year which would prevent inclusion of the $53,987.70 in income for that year. The amount of the one percent reserve, or $53,987.70, was never contested by the Navy. The right to this amount had accrued in fiscal 1960, athough the payment of this amount was deferred until final settlement. The petitioner contends that adjustments for labor or material costs, adjustments for claims arising under the contract, and the requirement that the petitioner execute a release prior to payment were events which made Stephens Brothers' right to the $53,987.70 contingent and therefore not includable in income for fiscal 1960. After careful consideration of the petitioner's arguments, it is held that the foregoing factors do not make Stephens Brothers' right to the $53,987.70 contingent. *332 Stephens Brothers had a fixed right to an ascertainable amount, $53,987.70, and the $53,987.70 219 should have been included in income of Stephens Brothers for the fiscal taxable year ended October 4, 1960. No claims for defective work or otherwise were made by the Navy against the petitioner after October 4, 1960. All three hulls were completed and finally accepted by the Navy in fiscal 1960. All construction work was deemed satisfactory at final acceptance. Stephens Brothers had no notice as of October 4, 1960, of claims held by the Navy arising out of the contract. Stephens Brothers' work was entirely satisfactory, and, as a result, there never were any claims by the Navy against Stephens Brothers, or Stephens Marine, for work under contract No. 3931. Therefore, the right to the one percent reserve for final settlement which had accrued in fiscal 1960 was not at any time subject to reduction for claims by the Navy against Stephens Brothers or its successor. The only claims arising from the contract were held by Stephens Brothers, and, subsequently, by petitioner. These claims were for increased costs and did not create a contingency or reasonable uncertainty as to the ultimate payment *333 of the $53,987.70. In this regard the petitioner asserts that it was required, as a condition precedent to being entitled to payment at final settlement, to execute a release discharging the Navy and its employees from all claims held by the petitioner; that the claims held by Stephens Brothers and then by petitioner were not all settled until several years after liquidation; and that the execution of the release was a contingency which prevented accrual of the $53,987.70 until payment on May 15, 1964. Therefore, the petitioner argues, the amount should not be accrued or included in income of Stephens Brothers for the fiscal year ended October 4, 1960. Petitioner's argument is not well founded. The condition precedent requiring Stephens Brothers or petitioner to execute a release before ultimate payment was not a contingency which would defeat the right to the amounts withheld. The execution of the release merely effected a delay in the time of receipt of the final payment. The right had accrued to Stephens Brothers upon final acceptance, and the right was not made contingent by the mere fact that Stephens Brothers could not enforce payment as of October 4, 1960. An argument similar *334 to petitioner's was presented in Commissioner v. Hansen, 360 U.S. 446 (1959). There it was stated: The taxpayers contend, first, that they cannot presently compel the finance companies to pay to them the amounts of their reserve accounts, and therefore they have not acquired a presently enforcible right to recover those reserves, and, hence, they should not be deemed to constitute accrued income to them. * * * But the question is not whether the taxpayers can presently recover their reserves, for, as stated, it is the time of acquisition of the fixed right to receive the reserves and not the time of their actual receipt that determines whether or not the reserves have accrued and are taxable. We think the above-quoted reasoning is controlling in the present controversy, and the mere fact that the petitioner is delayed in receiving payment to which it had a fixed right is not sufficient to permit deferral. Dingle-Clark Co., 26 T.C. 782 (1956). Finally, the petitioner has argued that the adjustments possible under the terms of the contract, either upward or downward, for labor or material costs, created a contingency or reasonable uncertainty as to ultimate payment of the amounts withheld. *335 Further, the petitioner suggests that this contingency existed prior to and as of October 4, 1960, and, therefore, the amounts withheld should not be accrued in income of Stephens Brothers for fiscal 1960. It is held that the provisions for labor and material adjustments did not create a contingency as of October 4, 1960, sufficient to prevent accrual of the $53,987.70 in Stephens Brothers' income for that year. There was a possibility that the total contract price could be adjusted downward as a result of a downward adjustment for combined labor and material costs, based on a Navy audit of Stephens Brothers' costs. But as of October 4, 1960, there was nothing to indicate that such a downward adjustment would become a reality. In fact, as of this date there were strong indications that the combined labor and material cost adjustments would result in an increase in the total contract price. Stephens Brothers had received the amount of $57,539.33 (see Issue 2) as a partial payment in the fiscal year 1960 for increased costs for labor based on a preliminary determination made from data submitted by Stephens Brothers. Stephens Brothers could be required to return the partial payment if *336 it was determined at the final adjustment, prior to final settlement, that Stephens Brothers was not entitled to increases for labor or material costs. However, it is concluded that the Navy would not have made the payment for increased 220 labor costs in 1960 if there had been any indications at that time that a downward adjustment would eventually be made for combined labor and material costs which would defeat or offset Stephens Brothers' right to the amounts withheld. It is to be noted that the petitioner has failed to introduce any evidence which suggests or indicates that as of October 4, 1960, a downward adjustment in labor costs or in material costs would be made. Petitioner has suggested that the contract presents such a possibility but the petitioner has not carried his burden of proof by presenting evidence which would show that there was a real possibility of a downward adjustment. The petitioner has relied on the contract provisions to suggest a theoretical possibility of a downward adjustment in the contract price from adjustments for labor costs and adjustments for material costs which could prevent Stephens Brothers from receiving the amounts being retained by the Navy. *337 But the petitioner has not presented any facts which indicate that as of October 4, 1960, a downward adjustment of the contract price and a consequent offset of the amounts retained would, in fact, occur, or even that Stephens Brothers, in fact, anticipated such a downward adjustment in the contract price. Therefore, petitioner has failed to carry its burden of proving that a contingency or reasonable uncertainty existed as of October 4, 1960, which prevented accrual of the amount in issue in income of Stephens Brothers for its last fiscal year ended October 4, 1960. The fact that there was a mere possibility that the contract price could be adjusted downward so as to prevent payment of the amounts withheld, absent any indications that the downward adjustment would result, is not a sufficient contingency to prevent accrual of the $53,987.70 in income in fiscal 1960. Stephens Brothers had a right to the amounts withheld, and, because there was nothing more than a theoretical possibility (that Stephens Brothers would not receive the reserve) existing at the end of the fiscal year, the amount should be accrued. Estate of B. F. Whittaker, 27 T.C. 399, 404 (1956); Dingle-Clark Co., 26 T.C. 782 (1956); *338 Harbor Plywood Corporation, 14 T.C. 158 (1950), affd. 187 F. 2d 734 (C.A. 9, 1951). Both Dingle-Clark and Harbor Plywood dealt with questions very similar to the one in the present case. In Dingle-Clark, the taxpayer, a corporation, had a long-term electrical contract which it was reporting for income tax purposes on a accrual method of accounting. Certain amounts were being retained from the taxpayer until completion of the contract. The respondent there contended that there were contingencies remaining under the contract which prevented accrual of amounts retained until the taxpayer's fiscal year 1950. The opinion sets forth the following (p. 791): The question of whether an accrual is proper cannot be determined by reference to all of the theoretically possible events which might affect the ultimate receipt of income. The question is a practical one to be decided in the light of known facts. When so considered, it is clear that there was no substantial contingency existing as of January 1, 1950, which could have prevented petitioner's ultimate receipt of the $79,288.85 invoiced prior to that date and retained by National. In Harbor Plywood, the taxpayer was a corporation which *339 was a member stockholder of a cooperative nonprofit association engaged in the export of plywood and other forest products authorized by the Webb Export Trade Act. Under the arrangement the taxpayer was entitled to payments, less expenses incurred, for its forest products exported by the association. The association made shipments for the taxpayer and credited the amount owing the taxpayer, sending a credit memorandum evidencing the amounts owed. The amounts credited to petitioner were withheld pending possible renegotiation of the forest product prices with the United States Government. The Court held that the fact that the amounts withheld from the accrual basis taxpayer were subject to renegotiation was not a contingency which would prevent accrual of the amounts owing in the year petitioner received the credit memorandum. In its argument, the petitioner has placed great emphasis on United States v. Harmon, 205 F. 2d 919 (C.A. 10, 1953). Petitioner contends that this case is controlling in determining whether the requirement of an audit creates a contingency preventing accrual of the amounts withheld by the Government. However, Harmon is distinguishable and not controlling in the *340 present controversy. In Harmon, the court held that the taxpayer did not have to report the amounts withheld as income until 1944, where construction was completed in 1943, because the right to the amount owing under the contract was not finally determined until the audit was taken in 1944. This 221 holding is distinguishable from the present controversy in at least two respects. In Harmon, the Government had not finally accepted the contract work until 1944, so that regardless of the audit, the taxpayer's rights could not have accrued until 1944. The concurring opinion stresses this point as the controlling element in the deferral of income until 1944. The second point is that under the terms of the contract in Harmon, the taxpayer's right to the amounts withheld did not become "due and payable" to the contractor until correctness of the final production costs had been "approved by such audit of the books of account of the Contractor and of those of all or such of its subcontractors, suppliers and servants as may be deemed appropriate by the Contracting Officer." In Harmon, the right to the amounts retained did not accrue until the audit, whereas in this case the right arose upon *341 final acceptance of the three minesweepers which occurred during Stephens Brothers' final fiscal year. See Dingle-Clark Co., supra, pp. 791-794, where this Court clarified the distinction between an audit upon which the right to income depends, and an audit which could affect the amount to be paid, where the right had accrued. Finally, in regard to this first issue, it is found and concluded that the amount to which Stephens Brothers' right had accrued was determined and definite in amount as of October 4, 1960. Security Flour Mills Co v. Commissioner, supra, p. 286. The amount withheld by the Navy as of October 4, 1960, was $59,987.70. The $6,000 was withheld out of the two percent performance reserve. The remaining $53,987.70 withheld was one percent of the adjusted contract price. The adjusted contract price as of October 4, 1960, was a definite amount, $5,398,769.86, and, therefore, the one percent reserve, $53,987.70, was definite in amount, also. Commissioner v. Henry Hess Co., 210 Fed. 2d 553 (C.A. 9, 1954), cited by the petitioner as authority for its contention that as of October 4, 1960, Stephens Brothers did not have a right to a determined or reasonably ascertainable *342 amount, is not applicable here, where Stephens Brothers had a fixed right to a determined amount, namely, to one percent of the adjusted contract price of $5,398,769.86, as it existed on October 4, 1960, or $53,987.70. The principle that income should be taxed to the earner should be applied here. Commissioner v. Kuckenberg, 309 F. 2d 202 (C.A. 9, 1962), reversing in part 35 T.C. 473; Jud,plumbing & Heating, Inc., supra, p. 134. Stephens Brothers, Incorporated, was the party to the Navy contract, and was the taxpayer who earned the income in the amount of $53,987.70, and that amount should be included in the income of Stephens Brothers, Incorporated, for its fiscal year ended October 4, 1960. In Jud Plumbing, the corporation reported income from long-term construction contracts on the completed-contract method, but it did not report any income from contracts which were uncompleted at the date of the corporation's liquidation. At the time of liquidation, the uncompleted contracts were transferred to the stockholders-petitioners, and they reported the income from the contracts, in their individual returns, for the year in which the contracts were completed. This Court held that the *343 method of accounting used by the corporation in its last taxable period did not clearly reflect income and that amounts earned by the corporation should be taxed to the corporation. The amount included in the corporation's income for the last taxable period before liquidation was computed by applying the ratio of costs incurred by the corporation to the total costs incurred under each contract, to the total contract price. The Court in its opinion emphasized that: "The fundamental concept of taxation is that income is taxable to him who earns it and that concept, we think, is correctly applied by the respondent here." Similarly, Stephens Brothers had earned the $53,987.70 in dispute, and it is held that this amount is includable in income for its last taxable year. Stephens Brothers had completed construction on all three minesweepers; they had been finally accepted by the Navy in fiscal year 1960; and all work and costs in the construction of the three vessels had been done and incurred only by Stephens Brothers. When the assets and liabilities of Stephens Brothers were transferred to Stephens Marine upon liquidation, all that Stephens Marine had to do was to await the payment of *344 the balance owing on the contract, with possible adjustments in the final amount. It was Stephens Brothers which had earned the income under the Navy contract, including the $53,987.70, namely, the adjusted contract price of $5,398,769.86, which included $53,987.70, plus $6,000 not in dispute. In fact, Stephens Brothers included and reported in its income for fiscal years 1959 and 1960 all of the total adusted contract price except $53,987.70, plus $6,000. 222 It is held that $53,987.70 is includable in the income of Stephens Brothers for the taxable year ending October 4, 1960. Petitioner has conceded that $6,000 is includable in income. Respondent's determination is sustained. Issue 2: Partial Payment for Increased Labor Costs; Navy Contract, $57,539.33 On or about January 27, 1960, within Stephens Brothers' final fiscal year, the Navy made a partial payment to Stephens Brothers of $57,539.33, for increased labor costs incurred by Stephens Brothers in the construction of the three minesweepers. (This amount and item is a different item from the amount involved in Issue 1, supra.) Stephens Brothers included the $57,539.33 in its gross income for its final fiscal year, and reported *345 this amount, together with other income, in its income tax return for that fiscal year, ending October 4, 1960. In the second amendment to its petition, petitioner has alleged that the $57,539.33 was improperly included in the income of Stephens Brothers for its final fiscal year, and should have been excluded from Stephens Brothers' income for that year ending October 4, 1960. Petitioner now claims a reduction in the income of Stephens Brothers in the amount of $57,539.33 for its final fiscal year, and this issue does not arise from a determination made by the respondent in his deficiency notice. The question is whether the $57,539.33 paid by the Navy and received by Stephens Brothers on about January 27, 1960, within its final fiscal year, adjustments for increased labor costs incurred in construction, was excludable from the income of Stephens Brothers for the year ended October 4, 1960. Petitioner contends that the $57,539.33 was in the nature of a loan or conditional advance and should not have been included in the income of Stephens Brothers for its final fiscal year. Under Amendment No. 4, in which the Navy made the payment of $57,539.33 based on a preliminary determination *346 of increased labor costs, the total contract price was not adjusted. The adjustment of the total contract price, the petitioner argues, came only with Modification No. 8, which modification was made by a letter issued by the Navy dated January 3, 1964. Petitioner argues that Amendment No. 4 provided that the $57,539.33 was subject to being repaid if the Navy finally determined that Stephens Brothers was not entitled to the amount, and, hence, the petitioner contends, the amount, $57,539.33, was in actuality a loan or conditional advance and should not be included in Stephens Brothers' income for fiscal 1960. In the alternative, the petitioner argues that the total contract price had not changed until Modification No. 8, which did not occur until January 3, 1964, and that $5,396,321.49 (including the $57,539.33) was reported in fiscal 1960, out of the total adjusted contract price at this date of $5,398,769.86 (exclusive of adjustments for labor or materials), and, therefore, the $57,539.33 was a partial payment of the $59,987.70, and the $57,539.33 out of $59,987.70 was reported in fiscal 1960 by Stephens Brothers. Consequently, the petitioner argues, only $2,448.37 was deferred by *347 Stephens Brothers from its income for the fiscal year ended October 4, 1960. The respondent, on the other hand, contends that Stephens Brothers had a right to the $57,539.33 as of fiscal 1960, resulting from a preliminary determination of increased labor cost based on data submitted by Stephens Brothers to the Navy Contract Audit Division. The respondent argues that Stephens Brothers had received the payment in fiscal 1960 under a claim of right, and that the payment was not in the nature of a loan. Further, respondent argues that the fact that the $57,539.33 was subject to being subsequently recouped by the Navy would not prevent its inclusion in income of Stephens Brothers for fiscal 1960. In regard to petitioner's alternative contention, respondent argues that Amendment No. 4 entitled Stephens Brothers to bill the Navy for the amount of the preliminary labor adjustment which increased the total billings by Stephens Brothers under the contract as of October 4, 1960, from the adjusted contract price of $5,398,769.86 to $5,546,309.19. Out of the total billings, $5,396,321.49 was reported (including the $57,539.33) by Stephens Brothers in its income for fiscal 1960, the difference from *348 total billings being $59,987.70. Consequently, the respondent argues, the $59,987.70 was not included but should be included in Stephens Brothers' income for its final fiscal year. It is held that the $57,539.33, received by Stephens Brothers in its fiscal year ended October 4, 1960, should have been reported in income for its final fiscal year, and that the $57,539.33 was properly included in Stephens Brothers' income for that year. 223 The petitioner has cited two decisions, Consolidated-Hammer Dry Plate & Film Co., 317 F. 2d 829 (C.A. 7, 1963), and Veenstra & DeHaan Coal Co., 11 T.C. 964 (1948), in support of its contention that the payments were in the nature of loans or conditional advances. Neither case is applicable to this case. Veentsar & DeHaan Coal Co., supra, is clearly distinguishable factually. In Veenstra the Court dealt with deposits made on a contract to sell coal during World War II, conditioned on the seller's ability to acquire the coal. If the coal could not be obtained, the seller was to return the deposit to the potential purchaser. In this case, the payments were made for labor costs which had been incurred in construction under the contract. Consolidated-Hammer Dry Plate, supra, *349 is also distinguishable. There the court held that partial payments made by the Air Force, for the construction of a vertical test camera, were in the nature of loans, where the contract provided that title to all existing and future material and goods acquired or produced in performance of the contract would automatically vest in the Government, and where the payments were made conditionally. The court held that the requirement that title to all future material and goods would vest automatically in the Government was a security arrangement, and that the advances were in the nature of a loan. This case differs from Consolidated-Hammer Dry Plate in that here there there was no contract arrangement that future goods or materials produced or acquired in connection with the minesweeper contract were to secure the partial payments. Moreover, the court observed in Consolidated-Hammer Dry Plate ( p. 832) that there was no evidence that any inspection or tentative approval by the Government had been given for any of the items shown on the invoices calling for partial payments, and that the partial payments had been made by the Government to the contractor without its first making inspection *350 and giving tentative approval to any of the items shown on the invoices; and that "after the partial payments were received [by the contractor] the invoices were found to be erroneous." Here, the payment was made only after an approval by the Navy, or a preliminary determination based on data submitted by Stephens Brothers, and evidence was submitted to the Navy which determined the right of Stephens Brothers to tentative adjustments, on which basis the Navy made the partial payment. Here there was no security arrangement, such as there was in Consolidated-Hammer; rather the payments were made pursuant to an approved claim submitted by Stephens Brothers. It is held that the partial payment for increased labor costs was not in the nature of a loan. The claim of right doctrine set forth in North American Oil Consolidated v. Burnet, 286 U.S. 417 (1932), is clearly applicable to Stephens Brothers with respect to the $57,539.33 received by that corporation for increased labor costs in fiscal year 1960. Stephens Brothers submitted the claim to the Navy, together with the data upon which the claim was based. The Navy paid the claim based on a preliminary determination of Stephens Brothers' *351 right to a payment. The payment of $57,539.33 was made on the basis of a claim of right to the amount. Furthermore, it is held that the fact that the partial payments might have been recovered by the Navy at some time subsequent to Stephens Brothers' fiscal year 1960 is immaterial to the question of whether they should be included in its income. Healy v. Commissioner, 345 U.S. 278 (1953); United States v. Lewis, 340 U.S. 590 (1951); North American Oil Consolidated v. Burnet, supra, p. 424. Therefore, it is concluded that the partial payment in the amount of $57,539.33, under Amendment No. 4 of the contract, was properly included in Stephens Brothers' income for its fiscal year ended October 4, 1960. Stephens Brothers' accounting treatment of the $57,539.33 is evidence of its understanding that it had a right to the amount received. Under Amendment No. 4, the Navy authorized the partial payment, and Stephens Brothers billed the Navy for that amount on the basis of this amendment. This billing was credited to Account 45, Credit Billings Receivable, and increased the total billings arising out of the contract to $5,456,309.39 as of October 4, 1960. When the payment were received, they *352 were reported by Stephens Brothers' accountants in the income of Stephens Brothers for its fiscal year 1960. Moreover, no limitations were placed on the amounts received. The payment of $57,539.33 was made by the Navy prior to October 4, 1960, and upon the receipt, Stephens Brothers deposited the amount 224 in a general bank account. There were no restrictions on the use of the amount received. The petitioner's alternative theory that all but $2,448.37 was reported prior to Stephens Brothers' liquidation is also incorrect. Under the terms of the contract, the adjusted contract price, which Stephens Brothers was entitled to bill the Navy, consisted of the original contract price, adjusted by changes resulting from change orders, exclusive of any adjustments for labor costs or for material costs. The adjusted contract price was $5,398,769.86 as of October 4, 1960. The adjusted contract price included the amount of $59,987.70 (Issue 1, supra) which had been withheld pending final settlement, but it did not include the $57,539.33 which Stephens Brothers had received under a claim of right in fiscal year 1960. All construction work had been completed and the three minesweepers had been *353 finally accepted. Therefore, Stephens Brothers had earned, and it had a right to bill the Navy for the entire $5,398,769.86, including the $59,987.70 withheld until final settlement. Stephens Brothers reported the $57,539.53 in its income for its final fiscal year. It correctly did so. The petitioner has failed to establish, now, that $57,539.33 should be excluded from the income of Stephens Brothers for the taxable year involved here, and the claim made to that effect is and must be denied. Issue 3: Pleasure Craft Contracts. This issue involves the treatment for income tax purposes, by Stephens Brothers, of payments it received during its last fiscal year in the total sum of $135,767 ($115,467 in cash and $20,300 in the trade-in of a used boat under a contract to build hull No. 72). The payments were received prior to October 4, 1960, under five contracts to build boats for individual purchasers, hulls Nos. 46, 61, 69, 70, and 72. Stephens Brothers did not include in its final tax return any income with respect to the five contracts. None of the boats was completed, or was expected to be completed during the last fiscal year of Stephens Brothers. All of the boats were completed by *354 Stephens Marine. Respondent's determination is that an allocation of part of the income (profit) from each contract (or boat) should be and should have been made, to the final taxable year of Stephens Brothers. He has stipulated that the total amount of such allocations of boat-contract-income to fiscal year 1960, under his theory and method of computation, is $32,972, rather than $37,735, as he originally determined in the deficiency notice. Petitioner (Stephens Marine) contends as follows: That in the building of pleasure boats for customers under contracts, it was a "custom manufacturer" selling goods on ordinary comercial terms, using an ordinary accrual method of accounting with respect to this minor part of its business. That since under each contract the title to the boat (hull), which was built in four to six months, remained vested in the builder (Stephens Brothers at first and later Stephens Marine) until the entire contract price shall have been paid to the builder (manufacturer), no income (or profit) under any of the five contracts accrued to Stephens Brothers during its fiscal year ended October 4, 1960, and no income was earned in the final year, notwithstanding its *355 receipts during that fiscal-taxable year of contract payments of $135,767, out of the total sum of the contract prices (under the five contracts) of $255,319. Petitioner argues that the reasoning of two cases supports its contention, Consolidated-Hammer Dry Plate & Film Co., supra; and Veenstra & DeHaan Coal Co., supra.Petitioner contends further that in the event that it is held that ssome income from the five contracts is includable in income for fiscal year 1960, then the amount now in issue ($32,972) should be reduced, or respondent's formula should be revised and adjusted. Respondent's determination, that of the profit of $72,143 under the contracts, a portion, $32,972, was earned by Stephens Brothers and is includable in its income for fiscal year 1960, was arrived at under the following arithmetic method: He determined the ratio, or percentage, of costs incurred by Stephens Brothers under the five contracts up to October 4, 1960, to total costs; he applied that percentage to the total profit attributable to each boat under each contract; and he then arrived at the portion of the profit earned under each contract by Stephens Brothers as of October 4, 1960, as follows (see Findings *356 of Fact): 225 Profit
%, 10-4-60
Hull
Per
Costs to
Profit,
No.
contract
final costs
10-4-60
46
$13,514
48.25
$ 6,521
61
15,615
10.56
1,647
69
9,235
72.09
6,656
70
14,365
65.19
9,364
72 19,414 45.24 8,784 $72,143
$32,972
It was the accounting procedure of Stephens Brothers to debit Accounts Receivable, Account 15, for the total contract price of a pleasure boat, with an offsetting entry to income, at the time that the contract for a boat was closed (when the final payment had been received, or the contract was otherwise closed). At the same time, any credit balance in Account 102, Customers Deposits (a deferred income account) was transferred as a credit to Account 15, supra, and the pertinent amount for labor and materials costs of the construction of the boat in Account 31, Work in Progress, New Construction, was charged out as costs of sale. Respondent contends that the accounting method of Stephens Brothers did not clearly reflect its income from the five uncompleted boats at the time of its liquidation and, therefore, that he was authorized by section 446(b) of the Code to use a method which properly reflects the income earned by Stephens Brothers in its final fiscal year, as of October 4, 1960. Section 446(b) *357 provides: (b) EXCEPTIONS. - If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. Respondent's determination under section 446(b), according to his view, was based upon what is in effect a percentage of completion accounting method, and he contends that under the facts here that method is the proper one to employ so that the income of Stephens Brothers in its last fiscal year is clearly reflected, and so that such income shall be taxable to the taxpayer who earned the income. Respondent relies on Jud Plumbing & Heating, Inc., supra, affirmed 153 F. 2d 681 (C.A. 5, 1946); Standard Paving Co., 13 T.C. 425, affirmed 190 F. 2d 330 (C.A. 10, 1951); and Henry A. Kuckenberg, 35 T.C. 473, affirmed on this point 309 F. 2d 202 (C.A. 9, 1962). He also cites Capital Engineering Co., 25 T.C. 1283. The parties disagree about the kind of method of accounting which was used by Stephens Brothers to account for its receipts and expenditures under the five contracts in issue for the construction *358 of private boats (sometimes called yachts by the parties). Petitioner contends that Stephens Brothers employed an "ordinary accrual" method of accounting. Respondent does not agree and contends that Stephens Brothers used a completed contract method of accounting. In Daley v. United States, supra, p. 471, the following observations were made: The accounting method employed on the day-to-day entries may be determinative as to whether the taxpayer has to report taxable income on the cash basis or on an accrual basis, but an election to report on the completed contract basis may be made irrespective of how the primary accounts are kept. We again emphasize that the controlling point is the time the costs and revenue from the contract are matched, and net income or loss ascertained. Therefore, when the completed contract method is sought to be used, the facts surrounding the election as to when to close the accounts, and ascertain the net income for the period, are controlling. The court also noted, pp. 475-476: It must be realized that the completed contract accounting procedure is not operative until the net income or loss is determined; and its use is not characterized by the entries *359 in the primary accounts. Either the cash receipts or an accrual method can be employed in the primary accounts of a concern electing to report taxable income upon the completed contract basis. Many accounting procedures can be grouped under the definition of accrual accounting. * * * Essentially, an accrual method recognizes income when the taxpayer has an unrestricted right to the money, and deductions are taken when "paid or accrued" or "paid or incurred", dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. Taxable income is reported upon an annual accounting concept. * * * As a matter of practice, either the completed contract or the percentage of completion method might be preferable to a more traditional accrual accounting system, and might reflect income more accurately. * * * The day-to-day bookkeeping entries employed by Stephens Brothers are not 226 controlling. Rather, its eventual method of reporting the gain from each contract is controlling. The evidence shows that Stephens Brothers reported the gain from such contract *360 in the taxable year in which a contract was closed on its books, upon the receipt of the final payment or otherwise, and in this way Stephens Brothers' construction costs under a contract were offset (or matched) against the full contract price in the taxable year when the contract was closed on its books; i.e., when the boat was completed and the buyer made his final payment. That method of reporting income for tax purposes repesents the completed contract method for reporting income. The basic factor in the completed contract method of reporting income is to match the total cost against the total receipts under a single contract, thereby adjusting the normal accounting period (or periods) to coincide with the completion or termination of a contract. Upon the evidence here, we agree with the respondent that Stephens Brothers reported the profit from each boat-construction contract, for tax purposes, on the basis of a completed contract method of accounting. We agree, also, that the reasoning of Jud Plumbing & Heating, Inc., supra, applies to this case under the facts; that the method of accounting of Stephens Brothers, at the time of its liquidation as of October 4, 1960, did not *361 clearly reflect its income from the five uncompleted boat contracts; and, therefore, that under section 446(b) of the Code, respondent had the right to employ and apply an accounting method which would clearly reflect the income from those contracts earned by Stephens Brothers during its final fiscal and taxable year. Petitioner contends, inter alia, that in the event that it is held that the reasoning and rule of the Jud Plumbing case applies here, then the computation of respondent resulting in the dollar amount of taxable income, $32,972, should be adjusted so as to determine that a smaller sum of income is taxable to Stephens Brothers as income earned in its final fiscal year. Briefly, petitioner argues that $32,972 is not a reasonable determination of taxable income, and that even no income from the private hulls contracts was earned in the year in question. Consideration has been given to these contentions and they are discussed hereinafter. In Jud Plumbing, supra, it was argued that the corporation involved there had no taxable income in the final year of its existence, at the time of dissolution, because the contracts in question there were not completed at the time of dissolution, *362 and the corporation's standard method of accounting took into account only profits and losses computed as of the date (and year) the contracts were completed; and it was also argued that the standard method of accounting of the corporation had been used consistently, so that respondent was without authority to compute taxable income by a different method merely because the corporation was liquidated. This Court, in Jud Plumbing, supra, rejected those contentions, and held that, p. 184: However, if a corporation using that method is liquidated during the taxable year and prior to the completion of the contracts, the completed contract method of accounting does not clearly reflect income for the final period of the corporation's existence. Therefore, under section 41 the respondent is authorized to recompute the corporation's income by the use of such method as will clearly reflect the income. The effect of the method used by the respondent in this proceeding is to reallocate the income from the contracts in proportion to the work done by the respective parties. The fundamental concept of taxation is that income is taxable to him who earns it and that concept, we think, is correctly *363 applied by the respondent here. In the instant case, the same reasoning applies under the facts here. See, also, Standard Paving Co., supra, and Henry A. Kuckenberg, supra. In this case, respondent used the percentage of completion method of accounting in allocating earned income in the amount (as adjusted) of $32,972 to Stephens Brothers as its income in its final taxable year. For reasons stated hereinafter, we believe that under the facts and circumstances, that method of accounting was a reasonable method for determining the amount of the boat-contracts income which is allocable to Stephens Brothers in its final year of business. In Hagen Advertising Displays, Inc., 47 T.C. 139, 148 (1966), this Court stated the following with respect to the respondent's authority under section 446: Section 446 provides that taxable income shall be computed under the method of accounting on the basis of which the 227 taxpayer regularly computes his income and keeps his books, but if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as in the opinion of the Commissioner does clearly reflect income. Section 1.446-1 (a) (2), Income Tax Regs., *364 provides that "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income." In numerous cases it has been held that section 446, as did its predecessor, section 41 of the Internal Revenue Code of 1939, vests the Commissioner with broad latitude in approving a taxpayer's accounting method, and the Court should not disapprove of the Commissioner's exercise of the discretion granted to him except where his action has been unsound. Schlude v. Commissioner, supra; Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957); Brown v. Helvering, 291 U.S. 193 (1934); and Automobile Club of New York, Inc., supra.See also Simplified Tax Records, Inc., 41 T.C. 75 (1963). It is clear that the respondent had the authority to determine whether Stephens Brothers' method of accounting with respect to the private boat contracts clearly reflected income and that if the method used did not clearly reflect income, the respondent had the authorization to recompute Stephens Brothers' taxable income in such way as would clearly reflect income. Unless the respondent's determination is shown by the petitioner to have been unreasonable, the respondent's *365 determination must be sustained. It is concluded that the petitioner has not established that the respondent abused his discretion by requiring that a portion of the profits resulting from the contracts for the five hulls should be included in the income of Stephens Brothers for its final fiscal year. The respondent is sustained in his determination that $32,972 resulting from the private hull construction contracts is includable in income for fiscal year 1960. Petitioner relies on Veenstra & DeHaan Coal Co., supra, and Consolidated-Hammer Dry Plate & Film Co. v. Commissioner, supra, in support of its argument that the payments received under the five contracts by Stephens Brothers ($135,767) in its final fiscal year were loans, or advances in the nature of loans, rather than payments of part of the contract price, and therefore these payments are not includable, either in whole or in part, in the income of Stephens Brothers for its final fiscal year. Upon the evidence, it is held that the payments in question in the aggregate amount of $135,767, under the contracts for hulls Nos. 46, 61, 69, 70, and 72, were not loans, or advances in the nature of loans, but were payments of part *366 of each contract price, to which Stephens Brothers had a fixed right in a certain amount at the time of each payment it received under each contract. Several evidentiary facts lead to this conclusion, the most compelling being found in the provisions of the standard form of contract used by Stephens Brothers in connection with the construction of private boats. The caption of the standard contract, "Agreement for Purchase", indicated that payments made pursuant to the terms of each contract were partial payments towards the purchase of a boat, rather than loans to finance construction. It is provided in each contract that payments are to be made "in consideration for" the vessel contracted for by each purchaser. Our conclusion is that the payments, in the aggregate amount of $135,767 which were made by the various purchasers and received by Stephens Brothers in its fiscal year ended October 4, 1960, were consideration for goods to be delivered in the future, and that they were not loans to enable Stephens Brothers to construct the boats. In the stipulation of facts the parties refer to the payments as advance payments, not as advances. Moreover, the provisions of the contracts for *367 the five hulls make no mention of loans or advances, and there is no language in any contract which makes the payments received by Stephens Brothers conditional payments. In fact, upon receipt of the payments, each was placed in a general bank account, and Stephens Brothers had the unrestricted use of the payments received. Furthermore, if there was a subsequent default in contract payments by a purchaser, Stephens Brothers had the right to retain all payments received previously from a purchaser, as well as the boat under construction. In regard to this question, the cases relied on by petitioner are clearly distinguishable on the facts. In Veenstra, supra, the taxpayer received deposits on contracts to sell coal during World War II, conditioned on the seller's ability to acquire the coal, which was scarce and in great demand at that time. There was a provision in that contract for a refund if the coal could not be supplied. In the instant case, there was no contract provision providing for a refund, and there was no contingency such as existed in Veenstra. In Consolidated-Hammer Dry Plate, supra, the Government contract provided that title 228 to all existing and future goods and *368 materials acquired or produced by the contractor, would vest automatically in the Government. The court held that the arrangement was a security device, and that the payments received were in the nature of loans. In this case, each contract for each of the five hulls provided that title to each boat would remain in Stephens Brothers, until the boat was completely paid for by the purchaser, after which delivery would be made. Finally, there is the question whether the method of accounting used by the respondent in making the determination in issue is so unreasonable and arbitrary that it should be disregarded. Upon consideration of all of the evidence and circumstances, it is concluded that it is probably the best method for determining the correct allocation of income to Stephens Brothers from each one of the five contracts. Moreover, in our opinion petitioner has not shown a better way to allocate the income. Respondent's determination is prima facie correct, and the burden of establishing a better method was upon the petitioner. Petitioner, in its brief, contends that this Court should make an adjustment in the figure $32,972, so as to reduce the amount of income which respondent *369 allocated to the final taxable year of Stephens Brothers. Petitioner contends that adjustments should be made with respect to the allocation of income earned by Stephens Brothers under the contracts to construct private hulls Nos. 46 and 61, and in other respects. Consideration has been given to these contentions but we are not able to agree with petitioner's contentions. Our conclusion is that hull No. 46 should not be regarded as a boat being built for inventory, or speculative, purposes. As of October 4, 1960, Stephens Brothers had expended $21,703 on material and labor costs, and it had received payments of $37,500 on the purchase price from Curtiss-Wright Corporation. The expenditures of Stephens Brothers represented 48.25 percent of the total cost of constructing this boat, and after renegotiating the contract for hull No. 46, Stephens Marine (the petitioner) received from William Wright the sum of $58,494 for the boat. Under all of the facts relating to hull No. 46, it must be concluded that Stephens Brothers earned in its final fiscal year the portion of the profit ultimately earned under that contract, namely $6,521, the amount of the profit which respondent allocated to *370 Stephens Brothers (part of the total sum of $32,972). Accordingly, it is held that with respect to this contract, respondent's determination must remain as determined by him, without any adjustment. His allocation, with respect to this contract, based upon the percentage of completion of hull No. 46 as of October 4, 1960, as reflected by the ratio of costs incurred to that date to final costs was proper. It is noted, further, that two cases cited by petitioner under this issue are distinguishable from this case on their own respective facts, South Lake Farms, 36 T.C. 1027, affd. 324 F. 2d 837 (C.A. 9, 1963); and United States v. Horschel, 205 F. 2d 646 (C.A. 9, 1953). The Horschel and South Lake Farms, each, involved the liquidation of a corporation, and the distribution of inventory assets which had appreciated in value as the result of the work and efforts of the liquidated corporation. In each case, the court held that the gain realized on the sale of the appreciated inventory assets by the distributees could not be taxed as income of the transferor corporations. In this case, the predecessor corporation, Stephens Brothers, had executed contracts for the sale of the five uncompleted *371 boats, and it had received partial payments of the contract prices for these boats in the total amount of $135,767 prior to its liquidation. In Horschel, and in South Lake Farms, each case, the predecessor corporation had not entered contracts to sell its appreciated inventory assets (apples) prior to liquidation, and the predecessor corporation had not received any payments for the inventory-assets prior to liquidation. Those cases are distinguishable. A Rule 50 computation is necessary because of adjustments to be made under stipulations of the parties. Decision will be entered under Rule 50. 229 Footnotes
*. Account No. 102, (Customers Deposits), and the account card pertaining to hull number 72 reflect the additional amount of $20,300 as being allowed by Stephens Brothers for a trade-in.
*. Difference between final sales price and final costs.↩